UNITED STATES (MOREHEAD v.). See Case No. 9,792.

---

## Case No. 15,807.

### UNITED STATES v. MOREL.

[Brunner, Col. Cas. 373; [1] 13 Am. Jur. 279.]

Circuit Court, E. D. Pennsylvania. 1834.

FEDERAL JURISDICTION — CRIMES COMMITTED IN FOREIGN COUNTRY.

The courts of the United States have not jurisdiction of crimes committed on board of an American vessel within the jurisdiction of a foreign sovereign; nor will the fact that a person stealing goods in a foreign port, brings them upon the high seas in an American vessel, give this jurisdiction to the federal courts.

[Approved in U. S. v. Seagrist, Case No. 16,-245. Cited in dissenting opinion in U. S. v. Rodgers, 14 Sup. Ct. 116, 150 U. S. 268.]

The defendant [John Peter Morel] was charged in four bills of indictment, as follows: (1) For having, on the 26th of December, 1832, on board of the sloop Charles William, belonging to three citizens of the United States, while lying in Great Harbor, in Long Island, one of the Bahama Islands, within the jurisdiction of the king of Great Britain, carried away, with intent to steal, certain goods of the master, and receiving and buying them, knowing them to be stolen; and in other counts charging the offense on the high seas. (2) The same as the first bill, omitting the counts for buying and receiving stolen goods, and in the second count, laying the offense as committed on the high seas. The two other bills varied the charge by describing the offense as a taking of the goods with intent to steal, and for receiv-

---

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

ing and concealing them, knowing them to be stolen.

After the indictments were read, and the prisoner had pleaded (not guilty and a former acquittal), the court suggested a question as to the jurisdiction, growing out of the language of the fifth section of the act of congress of the 3d of March, 1825 [4 Stat. 115], with a view to which the indictments were framed, namely, that it only embraced offenses against the person, and not such as were charged in the indictments. The testimony of the master and boy of the vessel were, however, heard, which seemed to prove the fact of the commission of the offenses charged, and described precisely the place where committed, when the court desired the counsel to speak to the question of jurisdiction.

Mr. Gilpin, U. S. Dist. Atty., and Mr. Troubat, for the United States.

G. M. Wharton, Mr. Hazelhurst, and D. P. Brown, for prisoner.

BY THE COURT. The indictment charges in the first count that the defendant, on the 26th day of December, A. D. 1832, at the district aforesaid, and within the jurisdiction of this court, on board of a certain vessel, to wit, a sloop called the Charles William, belonging to citizens of the United States, while lying in a place, to wit, Great Harbor, in Long Island, one of the Bahama Islands, within the jurisdiction of a certain foreign sovereign, to wit, the king of the United Kingdom of Great Britain and Ireland; the said defendant being a person belonging to the company of said vessel, with force and arms, did then and there feloniously take and carry away, with an intent to steal and purloin, certain personal goods of the said Samuel P. Watkins, to wit (enumerating the articles taken). The second count charges the offense to have been committed "on the high seas, out of the jurisdiction of any particular state, and within the jurisdiction of this court."

The district attorney having given the evidence on which he relies for the description or designation of the place where the offense was committed, the counsel for the defendant have excepted to the jurisdiction of the court, and the further progress of the trial was suspended until the opinion of the court could be taken on this question of jurisdiction. It has been fully argued, and will now be decided. It depends upon whether the place at which the fact was committed is a place over which the criminal jurisdiction of this court extends, according to the intent and meaning of the acts of congress, by which the jurisdiction is given, and by which it must be governed and limited. By the testimony of Samuel P. Watkins, the captain of the sloop, and owner of the property taken, it appears that, at the time the fact was committed, the sloop was lying at anchor in a place called the Great Harbor of Long Island, one of the Bahama Islands. He called it a locked harbor, which he says is where a vessel cannot get to sea, being land-locked by shoals or reefs. He describes it to be an indentation in the main land; that from the mouth or chops of this indentation to the bottom is about a mile; that it is about half a mile wide at the chops, and continues of the same width; that the sloop was about half a mile within the chops, and about midway between the shores, that is, about one fourth of a mile from the land on each side; that outside of this harbor, at the distance of about two miles, there are reefs and bars, over which the tide does not flow, and upon which the sea or ocean breaks; that the passage from the harbor out is narrow and difficult, and that you do not get to sea for about two miles. Such was the position of the sloop when the defendant took possession of her, and of all on board of her, and committed the fact charged in the indictment. Was it done on the high seas, within the meaning of the act of congress? The indictment is founded on the fifteenth section of the act of April 30, 1790 [1 Stat. 116]. This section enacts "that if any person within any of the places under the sole and exclusive jurisdiction of the United States, or upon the high seas, shall take and carry away, with an intent to steal and purloin, the personal goods of another," etc. The taking and carrying away in this indictment is charged to have been done on the high seas; was it so? Was the place where the fact was done the high seas in the general and legal meaning of the term, or as they are used in the act of congress?

Writers of high authority on this subject make a clear distinction between the main sea or the high sea, and roads, harbors, and ports, and we shall see that congress had these distinctions in view in framing the act in question. Lord Hale, in the fourth chapter De Jure Maris, says "that part of the sea which lies not within the body of a country is called the main sea or ocean." In the second chapter of second part he describes a road to be "an open passage of the sea," which, "though it lies out at sea, yet in respect of the situation of the land adjacent, and the depth and wideness of the place, is a safe place for the common riding or anchoring of ships." "A haven is a place of a large receipt and safe riding of ships, so situate and secured by the lands circumjacent that the vessels thereby ride and anchor safely, and are protected by the adjacent land from dangerous and violent winds." "A port is a haven, and somewhat more," that is, for arriving and unlading ships, etc. We see here a clear and reasonable distinction taken between the main sea or ocean, and such parts of its waters as may flow into places so situate and secured by the circumjacent land as to afford a harbor or protection for vessels from the winds,

which make the sea dangerous. The open sea, the high sea, the ocean, is that which is the common highway of nations, the common domain, within the body of no country, and under the particular right or jurisdiction of no sovereign, but open, free; and common to all alike, as a common and equal right. Mr. Webster, in his argument of Bevans' Case [Case No. 14,589], says there is a distinction between the meaning of the terms "high sea" and "sea"; that the high seas import the open, unenclosed ocean without the fauces terræ, and he is not contradicted by the opposite counsel. Certainly ports and harbors which lie within the body of a country are not part of the high seas according to Lord Hale's definitions. This learned lawyer further says, and we think with good reason, that "the common and obvious meaning of the expression 'high seas' is also its true legal meaning. The expression describes the open ocean where the dominion of the winds and waves prevails without check or control. Ports and harbors, on the contrary, are places of refuge in which protection and shelter are sought, within the enclosures and projections of land." So are the high seas distinguished from havens. This appears to us to be a just general view, without meaning to adopt the whole extent to which the force of the expressions might carry us.

The act of congress, so far from weakening, gives a strong confirmation to the definitions and distinctions we have alluded to; and the decisions of the supreme court upon this act entirely uphold them. On turning to the act it will be found that in describing the offenses over which jurisdiction is given to the courts of the United States, a material variance occurs in relation to the place at which the fact is committed, nor does this appear to have been the effect of accident, inadvertence, or caprice; at least no court can be justified in assuming that supposition as the ground of its opinion. Thus it is enacted by the eighth section that "if any person shall commit murder upon the high seas, or in any river, haven, basin, or bay out of the jurisdiction of any particular state," etc. But in providing in the twelfth section for the punishment of manslaughter, in describing the place, the "high seas" only are mentioned, and the words "any river, haven," etc., are omitted. So by the eighth section, robbing or piratically running away with a vessel is punishable by the courts of the United States, if done on the high seas or in any river, haven, etc.; but in the sixteenth section, which punishes the taking and carrying away the personal goods of another, with intent to steal or purloin them, the places within which the offense or fact must be committed must be "under the sole and exclusive jurisdiction of the United States, or upon the high seas," not a word is said about a river, haven, basin, or bay, out of the jurisdiction of any particular state. It would seem, then, that in re-

lation to these "kindred crimes," murder and manslaughter, robbery and larceny, congress has thought proper to make the sphere of jurisdiction in the higher crimes larger than for the lesser, leaving the latter to the courts of the nation within whose jurisdiction a crime was committed. The chief justice in U. S. v. Wiltberger [Case No. 16,738], says: "Congress has shown its attention to the distinction between the 'high seas' and a 'river, haven, basin, or bay,' and can we disregard it, especially under the well-known rule that a penal statute shall be construed strictly? If we were to adopt the construction contended for by the district attorney, there would be little or no difference between the high seas and a river, haven, basin, or bay; for if the ebbing and flowing of the tide, a fresh or salt water, are to make the difference, it is obvious that the high seas will be found to extend many miles into rivers, many miles into the interior of the country, and surrounded on many sides by countries. If all salt water below low-water mark be a part of the high seas, we shall find it where a sloop cannot float, and the water is never ruffled by the wind. If," says the chief justice, "the words be taken according to the common understanding of mankind, if they be taken in their popular and received sense, the 'high seas,' if not in all instances confined to the ocean which washes a coast, can never extend to a river about half a mile wide, and in the interior of a country." He evidently favors the opinion that the terms are confined to the ocean which washes a coast. But is not the case of an inlet or basin, half a mile wide, in the interior of the country, the same in principle as a river of the same description? The position of the water in relation to the adjacent country and the main sea, it being within or without a county or a local territorial jurisdiction, and not a common domain, an open highway for all nations, furnishes the characteristics of the high sea, and not the circumstance of the place being a river or a basin, salt water or fresh, above or within the flow of the tide; I mean in reference to the criminal jurisdiction of the court. As it must be conceded that the act of congress makes a clear distinction between the high seas and a river, haven, basin, or bay, it must follow that a place which falls under either of these descriptions cannot, in the construction of the act, be construed to be the high seas, for that would be to make them the same, and to confound what congress intended to separate. Adverting, then, to the place in which the offense in this case was committed, as described by Capt. Watkins, can we hesitate to say that it falls directly within the description of a haven, basin, or bay? And if so, it cannot be the high sea in the meaning of the act. Can it be called the open ocean, the high seas, according to any of the definitions or opinions we have referred to?

We have quoted Lord Hale's definition of a haven, as it seems to describe very exactly

the place in which the sloop was anchored. It was "a place for the receipt and safe riding of ships, so situate and secured by the land circumjacent that the vessels thereby ride at anchor safely, and are protected by the adjacent land from injurious or violent winds." Was not the "Great Harbor" of Long Island just such a place? Is it not so understood from its name, Great Harbor, to distinguish it from a smaller inlet of water from the sea, at some distance from it? Was the ocean, the high sea, ever called a harbor? If, then, we refer ourselves as the chief justice has done, "to the common understanding of mankind," to the understanding of those who have a particular and practical knowledge of the place in question, and we find them denominating it a harbor, which is a port or haven for shipping, how can we adjudge that this harbor is the high sea, which has forever been distinguished from a port or haven, both in its legal and common signification? To say that the high sea is a port or haven, or that a port or haven is a high sea, would be deemed an absurdity by all who have any knowledge of the terms. If we look to the English lexicographers for the meaning of these terms, "haven," "basin," "bay," we shall find no difference between them and Lord Hale; haven, a port, a harbor, a station for shipping; basin, a part of the sea enclosed in rocks; bay, an opening into the land where the water is shut in on all sides except at the entrance. Either of these definitions fully meets the description of the Great Harbor of Long Island, as given by Capt. Watkins, as well as by the draft or chart that has been shown to the court. If, then, the place in question be a basin, haven, or bay, it is exactly the sort of place mentioned in the act of congress, as distinguished from the high seas, in the same act, and cannot therefore be embraced in the term "high seas," as there used and intended. The place was the haven or harbor of the island, and no part of the high sea.

Some of the decisions of Judge Story are supposed to support the construction of the district attorney. They will not be found to do so. The case of U. S. v. Ross [Case No. 16,196], was an indictment for being present, aiding, and abetting in the murder of a colored man, on board the schooner Pocahontas, on the high seas, near the Cape de Verd Islands. The vessel was at anchor in an open roadstead or bay, near the island of St. Jago, about half a mile from the shore, and a mile from the town of Riga. By adverting again to Lord Hale, we shall see that a road is an "open passage of the sea"; that it lies out at sea; but that in respect to the situation of the adjacent land, and the depth and wideness of the place, it is a safe place for the common riding and anchoring of ships. This is wholly unlike the place in which the Charles William was lying in the harbor of Long Island. Judge Story in giving his opinion of the meaning of the act of 1790, says: "From the language of the act I am of opinion that the words 'high

seas' mean any waters on the sea coast, without the boundaries of low-water mark, although such waters may be in a roadstead or bay, within the jurisdictional limits of a foreign government." In the case before us the offense was not committed in waters on the sea coast, nor in a roadstead. By the coast I understand the edge of the land next the sea. In our case there was a bar or reef over which the sea did not flow. Between the sea and the entrance to this haven or basin you had two miles to go, says the captain, to get to sea; by which expression it is clear that the witness did not consider the water between the bar or reef and this basin to be the sea. The sea coast, then, was two miles outside of or beyond the entrance to this place or harbor. We have also shown that it is not a roadstead, and it is thus entirely clear of the opinion of Judge Story in the Case of Ross [supra]. In the case of U. S. v. Smith [Case No. 16,318], the vessel on board of which the crime was committed was lying outside the bar of Newburyport harbor, but within three miles of the shore. The judge thought she was on the high seas, "for it never has been doubted that the waters of the ocean on the sea coast, without low-water mark, are the high seas." The Charles William was lying inside the bar, in the port or harbor of Long Island and not on the waters of the ocean on the sea coast. In U. S. v. Hamilton [Id. 15,290], the judge only says that a ship lying in an enclosed dock in the port of Havre was not on the high seas. That was the case he had to decide. In case of The Abby [Id. 14], the vessel was five miles off Cape Elizabeth, and the judge says that "all waters below the line of low-water mark, on the sea coast, are comprehended within the description of the high seas."

If this indictment cannot be maintained under the law of 1790, it has been argued by the district attorney that it is embraced by the provision of the fifth section of the act of 3d of March, 1825. That section enacts that "if any offense shall be committed on board of any ship or vessel belonging to any citizen or citizens of the United States, while lying in a port or place within the jurisdiction of any foreign state or sovereign, by any person belonging to the company of the said ship, or any passenger, on any other person belonging to the company of the said ship, or any other passenger, the same offense shall be cognizable by the proper circuit court of the United States." It is contended that this provision is not confined to offenses upon or against the person, but extends to any wrong done to one of the ship's company, or a passenger, in his person or property. It appears to us that the obvious and only meaning of the words restricts the jurisdiction here given to the circuit courts to offenses upon the person of an individual, and cannot, by any reasonable construction, be extended to offenses upon or against the property of another. To adopt the construction contended for, we must strike

out these most significant words, or give them no meaning or effect, to wit, "on any other person belonging to the company of the said ship, or any other passenger," for without these words we should have the law precisely as it is said to be, with them by this argument. It is manifest that by omitting these words the section will have the general operation contended for, and that these words limit and restrain that operation, and are doubtless inserted for that purpose. We cannot erase this part of the section, nor refuse to give them their plain and obvious interpretation. We think the case is not embraced by this section.

Another attempt is made to sustain the prosecution; it is said that even if the original taking was in a place not within the jurisdiction of the court, yet that the goods were afterwards taken by the offender upon the high seas, and brought within the jurisdiction, which therefore attached to them, such bringing being in law a new taking and a new larceny; and it is likened to the taking stolen goods from one country into another. We do not see the analogy or agreement between the cases. No case has been shown where goods stolen in a foreign state or jurisdiction and brought into England were held to be within this principle of the common law. In 2 East, 776, after stating the principle that the possession of the goods by a thief is larceny in every country into which he carries them, the author gives the exception to this rule: "As where the original taking is such whereof the common law cannot take cognizance, as of goods obtained by theft or robbery at sea, and afterwards carried into some country; in which case the common law gives no jurisdiction to inquire of the felony." So of goods taken in Scotland, and brought into England. The decisions in the state courts of these United States have differed, upon extending this common law principle to the case of goods stolen in one state and carried into another, although it is adopted as to the counties of the same state. In Massachusetts and Connecticut the courts have recognized the principle in relation to different states; in New York and Pennsylvania the contrary doctrine has been asserted. In the case of Simmons v. Com., 5 Bin. 617, Chief Justice Tilghman gave the opinion of the supreme court. The property was originally stolen in the state of Delaware, and the thief brought it to this city. It was adjudged that he could not be indicted here for the felony. The chief justice considers the priciple even as to counties a subtle one, and does not seem inclined to favor it. As to the convenience of the practice, he says: "I had rather see one hundred culprits escape than extend such jurisdiction a hair's breadth beyond its constitutional limits." We think the prosecution cannot be supported on this ground.

The last effort made by the district attorney to bring the defendant within the grasp of the law, and we think the circumstances of the case, so far as we know them, fully justify all his zeal to punish the offender, is to contend that the offense described in the act of congress is not the technical common law crime of larceny, and therefore not to be judged by the rule which governs that offense, to wit, that it is committed and complete when and where the original taking of the goods is perpetrated; that the act does not speak of a larceny, or of stealing, but simply of taking and carrying away the goods with intent to steal or purloin them. The argument then is, that the carrying this property in or over a place, to wit, the high seas, which is within the jurisdiction of this court, is an offense cognizable by this court. It is to be observed that the carrying the goods is not a distinct substantive offense; the words of the act are, "shall take and carry away," not "or carry away." The crime is therefore complete when the goods are taken and carried the smallest distance from the place from which they were taken. Any further carrying does not add anything to the offense, much less can it create a new one. But to complete the description of the crime, there must be both a taking and a carrying away; and to give this court jurisdiction of it, both must be done in a place over which that jurisdiction extends. In meeting this point in this way, we would not be understood to sanction the opinion that the offense described in the act of congress is not a larceny.