[Crim. No. 4227. In Bank.—November 20, 1939.]

THE PEOPLE, Respondent, v. ANTHONY STRALLA et al., Defendants; HAROLD ADAMS, Appellant.

Joseph L. Fainer, Chauncey Tramutolo, Samuel L. Rummel, Louis P. Pink, Jerry Giesler and George M. Naus for Appellant.

Ben L. Blue, as *Amicus Curiae*, on Behalf of Appellant.

Earl Warren, Attorney-General, Bayard Rhone, Deputy Attorney-General, Buron Fitts, District Attorney, and A. H. Van Cott, J. J. Sullivan and Thomas F. O'Brien, Deputies District Attorney, for Respondent.

Frank E. Hinckley, Ben Harrison, United States Attorney, and Irl Brett, Assistant United States Attorney, as *Amici Curiae*, on Behalf of Respondent.

SHENK, J.—The grand jury of the county of Los Angeles returned an indictment against the defendant Adams and others, charging the violation of subdivision 2, section 337a, of the Penal Code. The specific accusation was the keeping and operating of the gambling ship "Rex" anchored in the waters of what is known as Santa Monica Bay, at a point four miles oceanward from the end of the municipal pier of the city of Santa Monica and approximately six miles landward from a line drawn between the headlands, Point Vicente on the south and Point Dume on the north. The defendant Adams appealed from the judgment of conviction and from the order denying his motion for a new trial.

There is no dispute as to the sufficiency of the evidence to support the jury's verdict if the offense was committed within the jurisdiction of the state. The appeal presents the single question whether the territorial jurisdiction of the State of California extends over the area of the waters known as Santa Monica Bay. If it does, an affirmance of the judgment will be required.

The territorial boundaries of the state were defined in the Constitution of California of 1849, article XII, section 1, which fixed the ocean boundary of the state as: "thence running west . . . to the Pacific Ocean and extending therein

three English miles; thence running in a Northwesterly direction and following the direction of the Pacific Coast to the forty-second degree of north latitude; thence on the line of said forty-second degree of north latitude to the place of beginning. Also, including all the islands, harbors, and bays along and adjacent to the coast." That language was readopted in the Constitution of 1879, section 1, article XXI, without substantial change. Section 33 of the Political Code enacted in 1872 provides that the sovereignty and jurisdiction of this state extends to all places within its boundaries as established by the Constitution, subject to qualification in cases where jurisdiction has been ceded to or acquired by the United States Government.

The immediate problem for solution is whether the waters commonly known as Santa Monica Bay were intended to be included within the designated territorial boundary. The answer comprehends not one, but several factors, namely: Is this body of water a bay geographically? Is it a bay historically? Is it a bay legally?

For the purpose of considering those factors this court may examine historical data and maps, public papers and records, and may take judicial notice of such geographical, historical and political data even though the same have not been introduced in evidence in the trial court. (Code Civ. Proc., sec. 1875; *Rogers* v. *Cady*, 104 Cal. 288 [38 Pac. 81, 43 Am. St. Rep. 100]; *Varcoe* v. *Lee*, 180 Cal. 338, 343 [181 Pac. 223].)

The waters known as Santa Monica Bay lie in an indentation of the California coast between Point Vicente and Point Dume. The points are distant from each other about 25 nautical miles or about 29 statute miles. The line of the coast forms a curve inward to a distance of about ten miles from a line drawn between the headlands. The line of the shore recedes slightly from Rocky Point, which is to the north of Point Vicente, making the distance between shores landward from Point Dume and Rocky Point greater than the distance between those two points. Otherwise the bay is widest between Point Vicente and Point Dume.

The foregoing geographic description appears to conform to the definition of a bay. Funk & Wagnalls New Standard Dictionary defines "bay" as "an indentation in the shoreline of a body of water; the water between two projecting headlands; sometimes, an arm of the sea connecting with

the ocean''. We find in Webster's International Dictionary: ''An inlet of the sea, usually smaller than a gulf, but of the same general character. The name is used, often for large tracts of water, around which the land forms a curve, or for any recess or inlet between capes or headlands; as, the Bay of Biscay; Hudson Bay.'' The Oxford English Dictionary (1933) gives: ''An indentation of the sea into the

land with a wide opening.'' The Encyclopedia Brittanica, eleventh edition: ''A wide opening or indentation in a coast

line. This may be of the same origin as 'bay', in the architectural sense, or from a Latin word which is seen in the place named Baiae." "A bay is a bending or curving of the shore of a sea or of a lake, and is derived from an Anglo-Saxon word signifying to *bow* or *bend*. ·For a similar reason the word bay is in Latin termed *sinus,* which expresses a curvature or recess in the coast." (*State* v. *Town of Gilmanton,* 14 N. H. 467, 477.) A visual illustration of the outline of the land surrounding the waters known as Santa Monica Bay, and of the land and waters constituting San Pedro Bay, is reproduced herein from a portion of a map designated as "United States—West Coast California, San Diego to Santa Rosa Island" (geodetic survey charts numbers 5144 and 5147), with lines drawn between headlands added. The waters known as San Pedro Bay extending from Point Fermin to the city of Huntington Beach, formerly called Point Lasuen, have been judicially declared to be a "bay." (*United States* v. *Carrillo,* 13 Fed. Supp. 121.) This map serves to give an easy and affirmative answer to the question whether the waters known as Santa Monica Bay are geographically a bay. Visually, if one of these bodies of water is a bay geographically, the other would seem also to be a bay.

Historically it appears that both Cabrillo (in 1542) and Viscaino (1603) noted this body of water as "Gran Ensenada" or "Grand Bay" (Bancroft's Works, vol. 18, History of California, vol. 1, 1541–1800, p. 71; Paulen's Atlas of Historical Geography of the United States, plate No. 17). Both Spain and Mexico claimed and exercised exclusive jurisdiction over the waters of this coast as far as the mouth of the Columbia River, for a distance of ten leagues into the ocean, and such claim was confirmed by treaty with Great Britain in 1790. (See *Ocean Industries, Inc.,* v. *Superior Court,* 200 Cal. 235, 242 [252 Pac. 722].)

Historians refer to the waters as Santa Monica Bay (Ingersoll's Century History of Santa Monica Bay Cities, p. 121; Charles Sumner Warren, History of Southern California; California Blue Book, 1932, p. 520.) They indicate that the bay received its present name probably earlier than 1827, and that the city of Santa Monica was named later. Rand-McNally & Co.'s Atlas of the World (United States, 1908, p. 277), contains the following statement: "The sea-coast of California extends the entire length of the State and is in-

dented by many bays and harbors, that of San Francisco being the finest on the Western coast, nearly fifty miles long and about nine miles wide. Other bays or harbors of importance are San Diego, San Pedro, Santa Monica, Santa Barbara, San Luis Obispo, Monterey, Tomales, Bodega, and Humboldt.''

Before 1872 ''Shoo Fly Landing'' on Santa Monica Bay afforded shipping facilities for the La Brea rancho. (Ingersoll, Century History of Santa Monica Bay Cities, p, 141.) The same writer, states (pp. 144, 145) that in 1875, in conjunction with the construction of a railroad, a new wharf, 1700 feet in length, reaching a depth of 30 feet at low tide, was completed and the first ship landed at this wharf in June of that year. Collis P. Huntington, about 1892–1893, was instrumental in building the ''Long Wharf'', 4600 feet, at a cost of about $1,000,000. (Newmark, Sixty Years in Southern California, 1853–1913.) Guinn's Historical and Biographical Record of Southern California (printed 1902, p. 139 et seq.), states facts showing the importance of Santa Monica as a shipping point.

The long struggle to obtain funds to establish a breakwater in either of Santa Monica or San Pedro Bays as a port for Los Angeles, which ended in the selection and establishment of the port in San Pedro Bay, has become part of historical Californiana. (Article ''The Battle for Southern Pacific Ports'', by Lanier Bartlett, in ''Westways'', August, 1935, pp. 26–29.)

The defendant quotes the following from the United States Coast Pilot, issued by the United States Department of Commerce under the supervision of the Coast and Geodetic Survey, page 57: ''From Point Vicente to Point Dume, about 25 miles, the coast forms a broad open bight about ten miles wide known as Santa Monica Bay''. He thus argues that an open bight is not a bay within the accepted terminology of what constitutes a bay. But we are also referred to the statement in the same survey that ''Monterey Bay . . . is a broad, open bight, twenty miles long, between Point Pinos and Point Santa Cruz, and nine miles wide . . . '' Monterey Bay was determined to be territorial waters in the case of *Ocean Industries, Inc.,* v. *Superior Court,* 200 Cal. 235 [252 Pac. 722].

The defendant contends that a body of water which may answer the definition of a bay, does not constitute a bay unless it also affords protection and safe anchorage to vessels engaged in shipping, and that Santa Monica Bay does not offer the advantages of a harbor. The evidence and the historical facts do not support the statement. The defendant refers to the discussion before the 54th Congress, 1896, as indicating a lack of secure refuge in Santa Monica Bay. But the evidence there produced does not necessarily negative the characteristics of Santa Monica as a bay or a harbor. The controversy centered on the problem of which bay, Santa Monica or San Pedro, was the better site for the project of establishing a port for Los Angeles.

In a history of the Los Angeles Harbor district, compiled by Ella A. Ludwig and published by the Historical Record Company, Inc. (California), referring to the report of the board of engineers appointed to investigate the question of which bay was the more eligible location for such a harbor, it is stated: "There was a lengthy and full comparison of the two places, Santa Monica and San Pedro. On the comparative advantages for arrival and departure, the board held that there was no essential difference between the sites of San Pedro and Santa Monica. The question of distance from Los Angeles was declared to be unimportant . . . On the question of construction, after going into all details, it was declared in substance that the cost of San Pedro would be much less than at either of the locations suggested at Santa Monica". The fact that San Pedro Bay was finally selected does not refute the evidence of use of Santa Monica Bay as a harbor. Nor is the fact that Santa Monica Bay affords less protection from northwesterly winds a controlling consideration. San Pedro Bay, situate on the southerly curve of the peninsula or projection of land formed by Point Vicente and Point Fermin, is open to southeasterly gales, as to which Santa Monica Bay, along the northerly curve of that peninsula, affords protection. Leading into the latter curve in Santa Monica Bay, a deep canyon, known as Redondo Canyon, provides passage for ships almost to the breakwater line along Redondo beach. Also, oceanward and to the northwest of Santa Monica Bay lie the islands of Santa Cruz and Santa Rosa; and to the southwest, Catalina and San Clemente Islands. The position of the islands undoubtedly

affords some protection against gales coming from their direction. In his Century History of Santa Monica Bay Cities, chapter 1, page 121, Ingersoll notes that ''the waters of this bay are ordinarily quiet since the force of the waves is broken by the seaward islands and the deep, recessed position of the shoreline''. Moreover, the ''Rex'', which has no motive power of its own, has been anchored at the same point in Santa Monica Bay for the past five or six years. If the question whether Santa Monica Bay is a harbor were important in the solution of the problem presented, the foregoing fact would tend strongly to refute the contentions of the defendant that Santa Monica Bay, as a harbor, is not within the territorial waters of the state.

In discussing the legal sources on the question of what constitutes a bay, the defendant places reliance upon the case of *United States* v. *Morel*, 26 Fed. Cas. 1310, No. 15,807, wherein a distinction was made between high seas, and roads, harbors and ports. After noting the distinctions made by Lord Hale in the fourth chapter De Jure Maris, the court said: ''We see here a clear and reasonable distinction taken between the main sea or ocean, and such parts of its waters as may flow into places so situate and secured by the circumjacent land as to afford a harbor or protection for vessels from the winds, which make the sea dangerous. The open sea, the high sea, the ocean, is that which is the common highway of nations, the common domain, within the body of no country, and under the particular right or jurisdiction of no sovereign, but open, free, and common to all alike, as a common and equal right''. And, quoting from Lord Hale, the court continued ''The expression [high seas] describes the open ocean where the dominion of the winds and waves prevails without check or control. Ports and harbors, on the contrary, are places of refuge in which protection and shelter are sought, within the enclosures and projections of land.'' It is obvious that the extent of the harborage offered by the places so described will vary; but mere variations which become apparent in making comparisons with other harbors may not preclude judicial recognition of Santa Monica Bay as a harbor, in view of its geographic conformation and the history of its uses as such.

Furthermore it does not appear that the law of nations defines, circumscribes or restricts the character of a body of water which may be included within the territorial bound-

aries of a country in accordance with the defendant's contentions. Many writers and courts have dealt with the question of what arms of the sea washing its coast may constitute the territorial waters of a sovereign state. It is now uniformly agreed that adjacent waters to the distance of three miles or a marine league are territorial waters subject, however, to the right of innocent passage by foreign ships. (Moöre, International Law Digest, vol. 1, pp. 698 et seq; *The Marianna Flora,* 11 Wheat. (24 U. S.) 1 [6 L. Ed. 405]; *The Ann,* 1 Fed. Cas., p. 926, No. 397; *In re Marincovich,* 48 Cal. App. 474, 477 [192 Pac. 156].) The prevailing claims of territorial jurisdiction over bordering waters and enclosed arms of the sea represent a diminution of the exclusive sovereignty over large bodies of water, such as the Adriatic, the Gulf of Genoa, the North Sea, and the Baltic Sea, which in earlier days were closed seas. ''Thenceforward the progress of maritime jurisdiction was reversed—from *mare clausum* to *mare liberum.* And the Sovereignty allowed by International law over portions of the sea is in fact a decayed and contracted remnant of the authority once allowed to particular states over a great part of the known sea and ocean. . . . The English claims dwindled to claims over territorial water close to the coast, and over portions of the sea interposed between promontory and promontory known as the King's Chambers, and over the whole of the narrow seas for ceremonial purposes.'' (Maine, International Law, 77, 79; see also Maxey, International Law, p. 228 et seq.) The latter authority says: ''That the jurisdiction of a state over its marginal waters rests upon international rather than municipal law seems to admit of little doubt;'' but he at the same time admits that there is no room for doubt that there exists the right to exercise such jurisdiction, and that the only dispute is as to the extent of it.

What are territorial waters for the purpose of excluding foreigners from exercising unregulated fishing privileges therein has generally been the subject of convention between nations. (See Moore, *supra,* p. 716 et seq.; note 46 L. R. A., p. 270.) In 1884 (150 MS Dom. Let. 6; Moore, *supra,* p. 718), Mr. John Davis, assistant secretary of state, in a reply concerning the subject of whale fishing off Bahia Bay on the Brazilian coast, expressed the following: ''The general law and rule is understood by this Government to be

that beyond the marine league or three-mile limit, all persons may freely catch whale or fish. In computing this limit, however, 'bays' are not taken as a part of the high seas; the three miles must be outside of a line drawn from headland to headland.'''

It is of important significance that our state legislature has designated nearly the entire area of Santa Monica Bay as state territory for the purpose of regulating fishing privileges in those waters (Fish and Game Code, Stats. 1929, p. 1181, Stats. 1933, p. 394, sec. 88), and has thus asserted the jurisdiction of the state for that purpose in and over the waters wherein the ''Rex'' is anchored.

One of the rights which it is stated justifies the doctrine of the territoriality of adjacent waters, is the right to exercise ''surveillance of ships which enter those waters, whether passing through or stopping there . . . in order to guarantee the efficient police and the development of the political, commercial, and fiscal interests of the bordering state''. (Moore, Digest of International Law, *supra,* pp. 698, 699.) Such right exercisable in adjacent waters would necessarily also be appropriate in territorial bays, harbors and inlets. The same authority indicates that the headland doctrine has received some limitation when the question has become the subject-matter of convention between nations. The three-mile limit applicable to adjacent waters was in some instances taken as restricting other coastal territorial waters to those inlets having an entrance six miles or two marine leagues in width. (See *Commonwealth* v. *Manchester,* [1890] 152 Mass. 230 [25 N. E. 113, 23 Am. St. Rep. 820, 9 L. R. A. 236]; *Manchester* v. *Commonwealth,* 139 U. S. 240 [11 Sup. Ct. 559, 35 L. Ed. 159]; *Mahler* v. *Norwich & New York Transportation Co.,* 35 N. Y. 352, 355.) A ten-mile headland doctrine has been asserted (Moore, *supra,* p. 720.) In 1896, when the extension of the territoriality of adjacent waters from one to two marine leagues was a subject of diplomatic conversation, Mr. Richard Olney, secretary of state, observed that ''an extension of the headland doctrine, by making territorial all bays situated within promontories twelve miles apart instead of six, would affect bodies of water now deemed to be high seas and whose use is the subject of existing conventional stipulation''. (Moore, *supra,* p. 735.)

Prior to that time, however, the United States had asserted jurisdiction over the waters of Delaware Bay. (Opinion of the Attorney-General, Edmund Randolph, 1793, Am. State Pap. For. Rel. L. 148; 1 Op. At. Gen. 32; *Emory* v. *Collings,* 1 Harr. [Del.] 325, 326.) The opinion of the attorney-general was concerned with the question whether the brig "Grange" was seized within territorial waters of the United States. The attorney-general quoted from and discussed the opinions of early text writers as authority for his conclusion that such waters were territorial, and then made this statement: "These remarks may be enforced by asking, What nation can be injured in its rights, by the Delaware being appropriated to the United States? And to what degree may not the United States be injured, on the contrary ground? It communicates with no foreign dominion; no foreign nation has, ever before, exacted a community of right in it, as if it were a main sea; under the former and present governments, the exclusive jurisdiction has been asserted. . . . "

Bristol Channel was held to be British territorial waters. (*Reg.* v. *Cunningham,* [1859] Bell's C. C. 72, 86.) Conception Bay on the coast of Newfoundland, having an average width of fifteen miles with the distance between the headlands more than twenty miles, has also been declared to be British territorial waters. (*Direct United States Cable Co.* v. *Anglo-American Telegraph Co.,* [1877] L. R. 2 App. Cas. 394.) In the course of the opinion in that case it was said: "Passing from the Common Law of England to the general law of nations, as indicated by the text writers on international jurisprudence, we find an universal agreement that harbours, estuaries, and bays land-locked belong to the territory of the nation which possesses the shores round them, but no agreement as to what is the rule to determine what is 'bay' for this purpose.

"It seems generally agreed that where the configuration and dimensions of the bay are such as to shew that the nation occupying the adjoining coasts also occupies the bay it is part of the territory; and with this idea most of the writers on the subject refer to defensibility from the shore as the test of occupation; some suggesting therefore a width of one cannon shot from shore to shore, or three miles; some a cannon shot from each shore, or six miles; some an arbitrary distance of ten miles. All of these are rules which, if adopted, would exclude

Conception Bay from the territory of Newfoundland, but also would have excluded from the territory of Great Britain that part of the Bristol Channel which in *Reg.* v. *Cunningham* (Bell's Cr. C. 72) was decided to be in the county of Glamorgan. On the other hand, the diplomatists of the United States in 1793 claimed a territorial jurisdiction over much more extensive bays, and Chancellor Kent, in his Commentaries, though by no means giving the weight of his authority to this claim, gives some reasons for not considering it altogether unreasonable.

"It does not appear to their Lordships that jurists and text writers are agreed what are the rules as to dimensions and configuration, which, apart from other considerations, would lead to the conclusion that a bay is or is not a part of the territory of the state possessing the adjoining coasts; and it has never, that they can find, been made the ground of any judicial determination. If it were necessary in this case to lay down a rule the difficulty of the task would not deter their Lordships from attempting to fulfil it. But in their opinion it is not necessary so to do. It seems to them that, in point of fact, the British Government has for a long period exercised dominion over this bay, and that their claim has been acquiesced in by other nations, so as to show that the bay has been for a long time occupied exclusively by Great Britain, a circumstance which in the tribunals of any country would be very important. And moreover (which in a British tribunal is conclusive) the British Legislature has by Acts of Parliament declared it to be part of the British territory, and part of the country made subject to the Legislature of Newfoundland."

On the other hand, we may note that by treaty between the United States and Great Britain, it was settled that the former government has no exclusive jurisdiction in the waters of Behring Sea outside of the three-mile limit. (27 Am. L. Rev. 703; *La Ninfa*, 75 Fed. 513.)

Chesapeake Bay, with an entrance of twelve miles between the headlands, was declared to be territorial waters. (Second Court of Commissioners of Alabama Claims, *Stetson* v. *United States*, No. 3993, Class 1. See Moore, Digest of International Law, vol. 1, p. 742.) It was there said: "Considering, therefore, the importance of the question, the configuration of Chesapeake Bay, the fact that its headlands are well marked,

and but twelve miles apart, that it and its tributaries are wholly within our own territory. . . . ; that from the earliest history of the country it has been claimed to be territorial waters, and that the claim has never been questioned; that it cannot become the pathway from one nation to another; and remembering the doctrines of the recognized authorities upon international law, as well as the holdings of the English courts as to the Bristol Channel and Conception Bay, and bearing in mind the matter of the brig Grange and the position taken by the Government as to Delaware Bay, we are forced to the conclusion that Chesapeake Bay must be held to be wholly within the territorial jurisdiction and authority of the Government of the United States and no part of the 'high seas' within the meaning of the term as used in section 5 of the act of June 5, 1872.''

In *Manchester* v. *Massachusetts,* 139 U. S. 240, at page 264 [11 Sup. Ct. 559, 35 L. Ed. 159], the Supreme Court of the United States said: ''The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and except so far as any right of control over this territory has been granted to the United States, this control remains with the State. . . . The statutes of the United States define and punish but few offences on the high seas, and, unless other offences when committed in the sea near the coast can be punished by the States, there is a large immunity from punishment for acts which ought to be punishable as criminal. Within what are generally recognized as the territorial limits of States by the law of nations, a State can define its boundaries on the sea and the boundaries of its counties; and by this test the Commonwealth of Massachusetts can include Buzzard's Bay within the limits of its counties.'' ■ Therefore the ''jurisdiction of the State of California over the sea is that of an independent nation'' (*Humboldt Lumber Manufacturers' Assn.* v. *Christopherson,* 73 Fed. 239 [19 C. C. A. 481, 44 U. S. App. 434, 46 L. R. A. 264, 282]), with the right to decide and prescribe its own boundaries.

■ The extent of territorial jurisdiction is primarily a question for the law-making power. (See note 46 L. R. A., p. 268.) In the case entitled *La Ninfa,* 75 Fed. 513, 518, it was said that in such controversies doubtful questions not thus decided are beyond the sphere of judicial cognizance and must

be met by the appropriate department of the state. It is true that the legislature has not expressly designated the boundaries of the state. But the fundamental law (Const., art. XXI, sec. 1) has declared that the territorial bounds of the state shall include the bays and harbors along its coast; and in enacting the Fish and Game Code the legislature has followed the constitutional declaration in respect to the waters of Santa Monica Bay. Moreover, it is doubtful whether the legislature, in view of the constitutional section, could renounce a right of territorial domain or abdicate any rights of dominion over waters which for a period of at least 400 years have been considered to be a bay, and over which the state has exercised territorial jurisdiction. (*Ocean Industries, Inc.,* v. *Superior Court,* 200 Cal. 235 [252 Pac. 722]; *Mahler* v. *Norwich & N. Y. Transp. Co.,* 35 N. Y. 352.) And certainly this court will not presume to do what the legislature could not do. What was said in the case of *Ocean Industries, Inc.,* v. *Superior Court, supra,* also serves to refute any inferences which might otherwise be considered to flow from legislative acts fixing the boundaries of Los Angeles County and the city of Santa Monica. (See Stats. 1850, p. 59; *Muchenberger* v. *City of Santa Monica,* 206 Cal. 635, 638 [275 Pac. 803].) ■ In the absence of any controlling legislative or executive act or judicial decision, the court will look to the international law, namely, the customs and usages of civilized nations. (*The Paquete Habana,* 175 U. S. 677, 700 [20 Sup. Ct. 290, 44 L. Ed. 320].) But resort to the law of nations does not disclose any agreed definition of what constitutes a bay which may be included within the territorial waters of a state. (See, also, *Ocean Industries, Inc.,* v. *Superior Court, supra,* p. 246.) On the contrary, as the foregoing discussion indicates, the usage and custom appears to be established to the effect that where, as here, the facts are that the bay is not and cannot become a pathway between nations; that exclusive jurisdiction has been asserted under both the present and former governments; that it has been recognized as a bay and as a harbor within the territorial boundaries of the state as prescribed by the law of the land, the courts have decided in accordance with the jurisdictional claim.

■ That a state has policing jurisdiction over its territorial waters may be said to be settled by the authorities

herein cited. (See, also, *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100 [43 Sup. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306].) In that case it was said: "It now is settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea along its coast and a marginal belt of the sea extending from the coast line outward a marine league, or three geographic miles. . . . 'The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation, within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.' " (Quoting from opinion of Chief Justice Marshall, in *The Exchange* v. *M'Faddon,* 7 Cranch, 116, 136 [3 L. Ed. 287].)

In line with the foregoing considerations the Bay of San Pedro (*United States* v. *Carrillo,* 13 Fed. Supp. 121), and Monterey Bay (*Ocean Industries, Inc.,* v. *Superior Court,* 200 Cal. 235 [252 Pac. 722]), have been judicially recognized as territorial waters of the state. There is not such a difference between the configuration and expanse of those bays and of Santa Monica Bay as would compel the invocation of the "rule of reason" referred to in the Carrillo case, for the purpose of rejecting the contention that Santa Monica Bay is within the territorial boundaries of California. That rule of reason does not persuade us to conclude that the waters of Santa Monica Bay, *per se,* beyond three miles from the shore, constitute a part of the open or high seas. We are not here concerned with a body of water comparable to the Behring Sea, or to the Gulf of Mexico mentioned as an example in the Carrillo case.

We conclude that geographically the waters known as Santa Monica Bay conform to the definition of a bay; that historically for a period of at least 400 years they have been known as a bay and during a large portion of that period have been used as a harbor; that the claimed jurisdiction of

the executive department of the state is in conformity with the law of nations; therefore, that Santa Monica Bay is one of the bays and harbors included within the territorial boundaries of the state by the Constitution. It follows that the jurisdiction of the state extends over the waters of Santa Monica Bay landward from a line drawn between its headlands, Point Vincente and Point Dume, and at least for a distance of three miles oceanward from that line, and that such jurisdiction may be exercised by the state for all proper purposes including the prosecution of violators of the penal laws of the state.

The judgment and the order are and each is affirmed.

Curtis, J., Waste, C. J., Gibson, J., and Carter, J., concurred.

Houser, J., did not participate in the foregoing decision.