Opinion
THE COURT.[1]
I. Introduction
Appellant, Walter Alvarado, challenges the denial of his motion to suppress following his arrest at a DUI (driving under the influence) checkpoint. He had been charged with driving under the influence and driving with a blood-alcohol level in excess of 0.08 percent.
The issue before us is whether the People sustained their burden of proof in establishing the factors under Ingersoll v. Palmer (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299] (Ingersoll). That case lists the factors governing whether a DUI checkpoint is operated in compliance with the Fourth Amendment of the United States Constitution. (People v. Banks (1993) 6 Cal.4th 926, 934 [25 Cal.Rptr.2d 524, 863 P.2d 769] (Banks).)
While we only follow established law here, we write to address what appear to be repeated difficulties encountered by the People in making the record required to establish the legitimacy of these checkpoints.
*Supp. 16 II. Factual Background
The location of the checkpoint was decided by Captain Greg Coralles, although there was no evidence presented on the factors considered by the captain, who did not testify. The court did hear from Sergeant Edgar Callejas, who testified that the location had been used as a DUI checkpoint about four to six times previously, although he did not say why. The date of February 1, 2009, was chosen because it was “Super Bowl Sunday,” and the police hoped to deter the drinking and driving which they felt generally accompanies such an event.
The officers brought five vehicles into the checkpoint area at a time. When the fifth vehicle left the checkpoint, the officers would bring in five more vehicles and repeat the process. Sergeant Callejas made the decision on the process and criteria used to select vehicles, after consultation with, and apparently relying in great part on, a more experienced officer, William Garcia, who was subordinate to Callejas. On occasion, the process was changed: When traffic flow was very light, the police would proceed with fewer than five cars at a time.
III. Discussion
Ingersoll prescribes these factors:
(1) Whether the decision to establish the checkpoint, the selection of the site, and the procedures for operation are established by supervisory law enforcement personnel;
(2) Whether motorists are stopped according to a neutral formula;
(3) Whether adequate safety precautions are taken, such as proper lighting, warning signs, and signals, and whether clearly identifiable official vehicles and personnel are used;
(4) Whether the location of the checkpoint was determined by a policy-making official, and was reasonable;
(5) Whether the time the checkpoint was conducted and its duration reflect “good judgment” on the part of law enforcement officials;
(6) Whether the checkpoint exhibits sufficient indicia of its official nature (to reassure motorists of the authorized nature of the stop);
(7) Whether the average length and nature of detention is minimized, and;
*Supp. 17 (8) Whether the checkpoint is preceded by publicity.
(Ingersoll, supra, 43 Cal.3d at pp. 1341-1347.)
Here, Alvarado contends that the prosecution failed to (1) establish that the selection of the checkpoint site and the procedures for the checkpoint operation were made and established by supervisory personnel; (2) establish that the officers employed a neutral formula for stopping vehicles during the checkpoint; (3) demonstrate that the checkpoint location was reasonable and effective in achieving the government interest of deterring drunk driving; (4) offer any evidence as to the length and nature of the checkpoint detentions; and (5) introduce evidence of advance publicity.
1. Role of Supervisory Personnel
The People introduced evidence that a captain ordered the checkpoint. While this was subject to a hearsay objection, the trial court properly overruled it because the statements of the captain were admitted to show that they were made, not for their truth. But as it happens, this evidence appears to have been immaterial. Undisputed evidence showed that it was Sergeant Callejas who endorsed and approved the procedures actually used. The procedures apparently endorsed by the sergeant differed appreciably from those (i) specified by the captain and (ii) on the forms used by officers at the scene.
Nothing in the record suggests the sergeant was the sort of “command level personnel” contemplated by Ingersoll. (Ingersoll, supra, 43 Cal.3d at p. 1342; see id. at p. 1341.) Thus the People did not present evidence on this factor.
2. Use of Neutral Formula
Alvarado argues that the trial court erred in finding that the checkpoint operated under a neutral formula because Officer Garcia did not follow the instructions on the official “Sobriety Checkpoint Form.” But it appears that the officer on the scene did employ neutral criteria, albeit a combination of two systems employed as traffic conditions dictated. The first system allowed five cars in at a time; once the officers were finished with the five cars, the next set of five would be admitted for examination.
While Officer Garcia testified he used this “five cars at a time” method “through the entire evening,” there were occasions when he gathered cars in groups of less than five. Garcia did this due to the nature of traffic flow, i.e., there may not have been five cars available and the police could not wait for an additional one or two more cars. Ingersoll contemplated such *Supp. 18 shifts: “Screening procedures may at times be altered consistent with traffic volume, such that, for example, every car might be stopped when traffic is light, but if traffic began to back up, a different neutral formula might be applied . . . .” (Ingersoll, supra, 43 Cal.3d at p. 1343.) While the record is most thin on this issue, we may infer that this second method too was neutral (vehicles “selected randomly”; second method “completely random”).[2]
3. Rationale of Checkpoint Location
Ingersoll stated: “The sites chosen [for sobriety checkpoints] should be those which will be most effective in achieving the governmental interest; i.e., on roads having a high incidence of alcohol related accidents and/or arrests. [Citation.] Safety factors must also be considered in choosing an appropriate location.” (Ingersoll, supra, 43 Cal.3d at p. 1343.) “[A] sobriety checkpoint would be improper at a location without any significant traffic or incidence of drunk driving . . . .” (Id. at p. 1344.) This factor is significant, because without it the essential deterrent effect of the sobriety checkpoint is not served. (Banks, supra, 6 Cal.4th at p. 944.)
There was no evidence explaining the selection of the specific checkpoint site used here. To be sure, there was evidence that the site had been used before. But there was no evidence that the intersection at issue had a high incidence of alcohol-related accidents. The trial court apparently sua sponte found that the location was on a “major thoroughfare” and, apparently, near a freeway. Even if the taking of judicial notice actually occurred, and assuming the process was handled properly,[3] the record only supports the finding that the locale was one where a good deal of traffic might be expected. The People’s suggestion here that, because it was “Super Bowl Sunday,” many people might be drinking and driving, would justify checkpoints in an almost infinite set of locations in the county. The record does not support a finding *Supp. 19 that the location here focused “on roads having a high incidence of alcohol related accidents and/or arrests.”[4] (Ingersoll, supra, 43 Cal.3d at p. 1343.)
4. Findings on the Length and Nature of the Detentions
Alvarado argues that the trial court erred by finding that the issue of timing and duration did not apply in the present case, and that there was no evidence proffered below on the length and nature of the checkpoint detentions. (Cf. Ingersoll, supra, 43 Cal.3d at p. 1327 [28 seconds for average detention, six minutes for those given field sobriety tests].) The trial court found that the factor did not apply in this case. The trial court was in error. As Ingersoll notes, “no hard and fast rules as to timing or duration can be laid down, but law enforcement officials will be expected to exercise good judgment in setting times and durations, with an eye to effectiveness of the operation . . . .” (Ingersoll, supra, 43 Cal.3d at p. 1345.) While the People’s brief suggests that such evidence was provided, it consisted of nothing except a statement that the procedures were designed to “keep traffic flowing.”
5. Lack of Advance Publicity
“Advance publicity is important to the maintenance of a constitutionally permissible sobriety checkpoint. Publicity both reduces the intrusiveness of the stop and increases the deterrent effect of the roadblock.” (Ingersoll, supra, 43 Cal.3d at p. 1346.) No such evidence was presented below.
Alvarado, citing Banks, supra, 6 Cal.4th 926, agrees that the lack of advance publicity alone will not render a sobriety checkpoint unconstitutional, but suggests that, in conjunction with other failures, the lack of advance publicity renders the sobriety checkpoint in this case unreasonable.
The People contend, and it appears the trial court agreed, that Banks eradicated the requirement of advance publicity. Not so. Banks expressly held that “nothing in [this] decision should be construed to suggest that any of the eight guidelines set forth in Ingersoll, including advance publicity . . . are not relevant to a consideration of the intrusiveness of a sobriety checkpoint stop.” (Banks, supra, 6 Cal.4th at p. 934, fn. 3, citation omitted, original italics.) Where lack of advance publicity is the sole infirmity in a checkpoint procedure, Banks instructs us to deny the motion to suppress; but where other problems are found, this factor may tip the scales in favor of granting the motion.
*Supp. 20 IV. Conclusion
Here, the record shows that the People did not sustain their burden as to at least (i) the role of supervisory personnel in prescribing the procedures to be used at the checkpoint, (ii) the rationale for selecting the particular location used for the checkpoint, (iii) the length of detentions, and (iv) advance publicity. We also note the thin evidence of neutral criteria used when fewer than five cars were pulled over at a time.
At least at first blush, the lacunae are bewildering: we assume the assistant district attorney had the same access as we do to the Ingersoll factors, and would by default present evidence on each. In this case, there is soriie hint that an important witness subpoenaed by the People never appeared, and it may be that the People had no choice but to proceed as they did.
Our role is only to evaluate the record here. Given the failure of proof on at least three important factors and one less important factor (advance publicity), we are obliged to reverse the denial of the motion to suppress.
Reversed.

 Jackson, Acting P. J., Kamow, J., and McCarthy, J.

 Alvarado notes that during the stops, Officer Garcia made entries on a sobriety checkpoint form indicating the number of cars stopped at a time, and the number of cars allowed through without detention. However, argues Alvarado, Garcia did not follow any of the six “Instructions for Completion” on the form. We agree, but our review of the somewhat ambiguous record suggests that the departure from protocol had to do with either (i) only the means of marking the cars stopped and allowed through, or (ii) to the extent it modified the procedures, it modified them to an alternative means of selecting the cars, which as we note in the text appears to also have been pursuant to neutral criteria.

 Under Evidence Code section 452, subdivision (g), these sorts of geographical features are a proper subject of judicial notice. (See Colberg v. California (1967) 67 Cal.2d 408, 423 [62 Cal.Rptr. 401, 432 P.2d 3]; People v. Stralla (1939) 14 Cal.2d 617, 620 [96 P.2d 941]; City of Anaheim v. Workers’ Comp. Appeals Bd. (1981) 116 Cal.App.3d 248, 261 [172 Cal.Rptr. 92].) Nevertheless, there is an important procedural aspect to such notice, such as notice to the parties and an opportunity to respond, which was not provided here. (Evid. Code, § 455.)

 We reject Alvarado’s argument that Ingersoll, supra, 43 Cal.3d at page 1343, requires checkpoints solely at the single “most effective” location. That is, we believe that a plurality of locations may satisfy the Ingersoll criterion at the same time—as long as each is picked because of high risk of alcohol-related accidents and/or arrests.