[S. F. No. 12290. In Bank.—January 11, 1927.]

OCEAN INDUSTRIES, INC. (a Corporation), Petitioner, v. THE SUPERIOR COURT OF SANTA CRUZ COUNTY et al., Respondents.

[1] JUDICIAL NOTICE—BOUNDARIES OF STATE—FISHERIES—PROHIBITION. In a proceeding for a writ of prohibition to restrain the superior court from further proceeding in an action instituted by the state to enjoin the plaintiff herein from carrying on its operations for the reduction of fish or from using any fish of the variety known as "sardines" in the reduction plant upon the ship of plaintiff while situated at a certain place of anchorage, the court is entitled to

---

1.   See 10 Cal. Jur. 716; 15 R. C. L. 1092.

take judicial notice of the political history of the world in determining whether the ship, where anchored, is within or without the boundaries of the state of California.

[2] NAVIGABLE WATERS—BAY OF MONTEREY—DEFINITION.—The bay of Monterey, designated from its first discovery as a "bay," being a body of water having headlands approximately eighteen miles apart, with receding shores, giving a total width of twenty-two miles inside the headlands, with a total depth of approximately nine miles, satisfies the definition of a "bay" given by the lexicographers as a body of water around which the land forms a curve, or a recess or inlet between capes or headlands.

[3] ID.—TREATY OF GUADALUPE HIDALGO—TERRITORY ACQUIRED BY.— By the treaty of Guadalupe Hidalgo, between the United States and Mexico, the former acquired jurisdiction over the region therein ceded, both territorial and maritime, which Mexico had theretofore asserted, and which embraced all of the ports, harbors, bays, and inlets along the coast of California and for a considerable, though perhaps indefinite, distance into the ocean, including dominion over the numerous islands lying therein adjacent to said coast.

[4] ID.—FIRST CONSTITUTION OF CALIFORNIA—DESCRIPTION OF BOUNDARIES OF STATE — INCLUSION OF BAYS. — The language of article XII of the constitution of California adopted in 1849, describing the boundaries of the state, particularly in view of the past political history of the region, was clearly intended to embrace within the boundaries and jurisdiction of the state of California the entire area of all those several bays and harbors which indent its coast.

[5] ID.—DEFINITION OF BOUNDARIES OF STATE BY LEGISLATURE—CONSTRUCTION OF ACT OF 1850.—The act of the first legislature of California, creating and defining the boundaries of the several counties of the state (Stats. 1850, p. 58) must be interpreted, if reasonably possible, so as to reconcile its terms with the language of the constitution, since it would not be presumed to be the intent of the legislature to do that which it would have no power to do, viz., to exclude from the jurisdiction of the state of California or its political subdivisions any of its land or water areas which had been embraced therein by the express terms of the constitution; and if there are any ambiguities in said act they are to be resolved in harmony with the text of the organic law.

[6] ID.—COAST LINE—BOUNDARY INTO OCEAN.—The description in the act of 1850 (Stats. 1850, p. 58), with reference to the boundaries of Santa Cruz County, "thence down the middle of said river to

3.  See 1 Cal. Jur. xiv.

the Bay of Monterey and three English miles *into the ocean*," did not mean by the italicized phrase *"into the Bay,"* as this construction would not only do violence to the words of the act, but would exclude the larger portion of Monterey Bay from the boundaries and jurisdiction of the state of California despite the very plain inclusion therein of the entire bay according to the constitution; and the phrase "parallel to the coast" in said description is applied to the general coast line, regardless of the bays and inlets along the respective coast lines and may reasonably be interpreted to be consistent with the constitution which includes within the state boundaries all islands, harbors, and bays along and adjacent to the coast.

[7] ID.—JURISDICTION OVER MONTEREY BAY—ADOPTION OF POLITICAL CODE—BOUNDARIES.—The legislature in the adoption of the Political Code in 1872 left the boundary of the county of Santa Cruz substantially unchanged on its oceanward side but changed the boundary description of the county of Monterey to read, "beginning *in the Pacific Ocean* at the southwest corner of Santa Cruz," etc., and the entire bay of Monterey within its headlands and thence into the ocean for a distance of three nautical miles was thus definitely placed within the sovereignty of the state of California and within the boundaries and jurisdiction respectively of the counties of Santa Cruz and Monterey.

[8] ID.—JURISDICTION OVER BAYS—EXTENT OF—INTERNATIONAL LAW.— The contention that by the rules of international law territorial jurisdiction of a maritime state does not extend beyond three miles from the shore line and follows the indentations of the coast into all bays or gulfs, the headlands of which are more than six miles apart, cannot be maintained, as, while it is true that by treaties and conventions between the powers chiefly in arbitration cases the fixation of a six-mile distance between headlands of certain bays and inlets has at times been agreed upon in the settlement of international disputes, it cannot be said that there is any rule of international law upon the subject, the whole matter resting in the undisputed assertion of jurisdiction by the power possessing the inclosing shore line of the bay or inlet in question.

[9] ID.—BAY OF MONTEREY—BOUNDARIES OF STATE.—The bay of Monterey between its headlands and the ocean adjacent to a line drawn between these headlands for a distance of three nautical miles is within the boundaries of the state of California and of the counties respectively of Santa Cruz and Monterey.

[10] ID.—JURISDICTION OF SUPERIOR COURT—INJUNCTION.—The superior court of Santa Cruz County has jurisdiction of an action to enjoin a corporation from carrying on the business of catching sardines and the reduction thereof for the production of fish-meal and oil, on its ship anchored in Monterey Bay, in violation of the laws

of California, although said point of anchorage is more than three and one-half miles distant from the nearest low-water mark.

(1) 23 C. J., p. 116, n. 84.   (2) 7 C. J., p. 1014, n. 35 New. (3) 38 Cyc., p. 967, n. 65.   (4) 36 Cyc., p. 830, n. 26.   (5) 12 C. J., p. 788, n. 1, p. 790, n. 2; 36 Cyc., p. 843, n. 39 New.   (6) 15 C. J., p. 397, n. 9 New.   (7) 36 Cyc., p. 830, n. 26.   (8) 33 C. J., p. 407, n. 75.   (9) 36 Cyc., p. 830, n. 26.   (10) 15 C. J., p. 985, n. 42.

APPLICATION for Writ of Prohibition to prevent the Superior Court of Santa Cruz County from proceeding in a certain suit for an injunction.  Writ denied.

The facts are stated in the opinion of the court.

Loucks & Phister and Cushing & Cushing for Petitioner.

B. D. Marx Greene for Respondents.

RICHARDS, J.—The petitioner herein applied for the issuance of a writ of prohibition whereby it sought to have the respondent Superior Court of the State of California in and for the County of Santa Cruz, and the Judge thereof, commanded to desist and refrain from any and all further proceedings in a certain action pending in said court entitled "People of the State of California, Plaintiff *vs.* Ocean Industries Inc. a corporation et al., Defendants," and particularly from making or entering any preliminary or other injunction affecting said defendant in said action.  In support of its said application the petitioner alleged that it was a corporation duly organized as such under the laws of the state of Nevada for the purpose of carrying on the business of catching and cleaning fish and extracting the oil therefrom, in the waters of the Pacific Ocean at divers places along the coast line of North America between the parallels of 25 degrees and 40 degrees north latitude; and that in order to carry on its said business the petitioner had during the month of September, 1926, purchased and registered a certain vessel named "Peralta" and had fitted out and equipped said vessel with the necessary machinery and equipment for the production of fish-meal and the extraction of oil from fish, and had thereafter and during the month of October, 1926, moved the said vessel to and anchored the

same at a point designated as 121 degrees 55 minutes 12 seconds west longitude and 36 degrees 53 minutes 12 seconds north latitude, which said point of anchorage was and is more than three and one-half miles distant from the nearest low-water mark on the shores of the Pacific Ocean and of the mainland or of any island or islands adjacent thereto; and that said petitioner is engaged in and proposes to carry on its aforesaid business and operations thereat, using in the course thereof fish caught in the waters of the Pacific Ocean more than three and one-half miles distant from the said coast line. The petitioner further alleges that on the eighteenth day of October, 1926, the people of the state of California, through its attorney-general and certain other of its officials, caused to be filed in the Superior Court in and for the said county of Santa Cruz a complaint for an injunction, a copy of which is attached to its said application, wherein the said plaintiff sought to have the petitioner herein enjoined from conducting or continuing its said operations upon said vessel at its said place of anchorage; that thereupon and on said last-named date the said court and the judge thereof made and entered its order directing said defendant in said action, its officers and employees, to show cause at a designated time before said court why a preliminary injunction should not issue in said action as prayed for therein, and also in the meantime caused to be issued a temporary restraining order of like tenor and effect, both of which said orders are also attached as exhibits to petitioner's said application; that copies of said orders together with a copy of the complaint and summons in said action were served upon the defendant therein as provided by law; that said defendant, the petitioner herein, appeared in said court in response to said orders and process and thereupon presented and filed a certain affidavit in denial of certain of the averments of said complaint, a copy of which affidavit is also attached as an exhibit to the petitioner's application herein and from which it appears that the substantial allegations of the petition are set forth in said affidavit; that a hearing was thereafter and on the twenty-sixth day of October, 1926, had before said court upon the matters referred to in said complaint and orders and the defendants' return thereto, at the conclusion of which hearing the said Superior Court made and entered its order determining that

the plaintiff in said action was entitled to a preliminary injunction restraining the defendant therein from further carrying on any operation or operations for the reduction of fish or from using any fish of the variety known as "sardines" in the reduction plant upon said ship while situate at its said place of anchorage; and said court announced as a result of its said determination that it would make and enter a preliminary injunction accordingly and that said court threatens and will, unless prohibited therefrom by this court herein, make and enter and enforce such injunction. The petitioner further alleges that the issuance and enforcement of said preliminary injunction as proposed and threatened by said court is in excess of and beyond the jurisdiction of said court for the reason that the said place of anchorage of said vessel and the place where the said plant of the petitioner herein is being and is proposed to be operated is outside of the state of California and is outside of and beyond the jurisdiction of said court. Finally, the petitioner alleges that the effect of the operation and enforcement of said preliminary injunction would work irreparable injury to the petitioner herein in ways which are set forth with much of detail in its said application; wherefore it prays the issuance of the peremptory writ sought herein.

To the foregoing petition the respondents have made their reply by way of both demurrer and answer, by the first of which pleadings they put in issue the main considerations presented to this court for its determination herein, and to these we will first direct our attention. The preliminary questions thus presented for our solution are, first, as to whether the ship "Peralta" upon which the petitioner herein is engaged in conducting its aforesaid operations and upon which it intends to continue the same unless prevented from so doing by the preliminary injunction proposed to be issued by the respondents herein, is at its admitted place of anchorage, within or without the boundaries of the state of California; second, whether the aforesaid operations of said petitioner upon said vessel and at said point, if within the boundaries of the state of California, are in violation of its laws. The precise point in issue under the first of these propositions has been made very definite by the presentation on behalf of both of the parties hereto in their plead-

ings and upon the hearing hereon of certain maps and plats delineating the boundaries and dimensions of the bay of Monterey, as well as the exact location of the ship "Peralta" within the headlands of said body of water, but more than three nautical miles from low-water mark along the shore line thereof. If it shall be found as a matter of law that the entire area of the bay of Monterey, so called, extends oceanward to a line drawn between the headlands thereof; and if it shall further be found that said entire area of said bay of Monterey is to be held included within the territorial boundaries of the state of California, it would follow irresistably that the ship "Peralta" at its designated place of anchorage is within said state and is subject to its laws. [1] Upon the solution of the problem thus presented this court is entitled to bring to bear, in so far as it may be aided thereby, its judicial notice of the political history of the world (Code Civ. Proc., sec. 1875, subd. 8), when in the early years of the sixteenth century of our era Spain through her voyagers had discovered and through her conquistadores established her dominion over that region in the southwestern portion of North America which became known as "New Spain" she began through her viceroys to send forth navigators to the northward along the western coast of the continent, with the twofold object of adding further territory to her domain and of discovering the fabled northwest passage. The first of these navigators to thus extend his voyages beyond what is now known as Lower California was Juan Cabrillo. This bold navigator after a stormy voyage up an unknown coast sighted the wooded headland to which he gave the name of Point Pinos and sailed into the body of water behind it, to which, as recorded in his log, he also gave the name "*Bahia de Los Pinos*," the Bay of Pines. He was followed in 1602 by another navigator, Sebastian Vizcaino, who also found and entered the same incurved body of water upon the inner shores of which he landed, taking formal possession of its coasts in the name of his sovereign and rechristening it "*Bahia de Monterey*," in honor of his patron the Count de Monterey, then viceroy of New Spain, which name it has ever since borne in the official records of Spain, of Mexico, the United States, and state of California. [2] The bay of Monterey, thus designated from its first discovery as a "bay," is a body of water having

200 Cal.—16

headlands approximately eighteen miles apart, with receding shores, giving a total width of twenty-two miles inside the headlands, with a total depth of approximately nine miles. It thus satisfies the definition of a "bay" given by the lexicographers as a body of water around which the land forms a curve; or a recess or inlet between capes or headlands. (Webster, Title "Bay.") It is needless to detail the history of the increasingly troubled effort of Spain and later of Mexico to assert and maintain the sovereignty of each in turn over the indefinite region known as California and its adjacent islands, inlets, and seas; but the interesting fact may be noted as having its bearing upon whatever question of international law is involved herein that the dispute between Spain and England in the year 1790 growing out of the northwest coast fur trade was for the time being settled by the so-called Nootka Convention, wherein as between these two powers, which were then the greatest maritime powers of the known world, it was agreed that the exclusive sovereignty of Spain should be recognized and respected over all parts of the northwest coast already occupied by subjects of Spain and for a distance of ten leagues into the ocean. The agreements of this convention were ratified by the contracting powers and the claims of Spain to exclusive sovereignty and jurisdiction over the coasts of what is now California and Oregon as far north as the mouth of the Columbia River on land and to a distance of ten leagues into the ocean were conceded and confirmed. This jurisdiction over these coasts and seas and adjacent islands Spain and her successor Mexico thereafter asserted and insisted upon through rigid maritime regulations over the increasing coastal traffic during the half century or so following the date of said treaty and down to the time of the occurrence of the war between the United States and Mexico and consequent seizure of California by the former, manifested by the raising of the American flag at Monterey on July 7, 1846, and by the subsequent events which marked the passing of the old dominion. [3] By the terms of the treaty of Guadalupe Hidalgo, which was finally ratified at the city of Queretaro on May 30, 1848, Mexico ceded to the United States all territory lying to the northward of a line drawn from the mouth of the Rio Grande westerly to the Pacific Ocean. By virtue of this treaty the United States assumed

that jurisdiction over the region thus ceded, both territorial and maritime, which Mexico had theretofore asserted, and which embraced all of the ports, harbors, bays, and inlets along the coast of California and for a considerable though perhaps indefinite distance into the ocean, including dominion over the numerous islands lying therein adjacent to said coast. [4] When in the course of events the duly constituted framers of the constitution of California assembled at Monterey in the autumn of 1849 and proceeded to frame the first constitution of California they inserted in article XII thereof a description of the boundaries of the state, which, in so far as the southerly and westerly lines thereof were concerned, read as follows: "Thence running west and along said boundary line [the Mexican boundary] to the Pacific Ocean, and extending therein three English miles; thence running in a northwesterly direction and following the direction of the Pacific coast to the forty-second degree of north latitude; thence on the line of said forty-second degree of north latitude to the place of beginning. *Also all the islands, harbors and bays along and adjacent to the coast.*" This language in our first constitution, particularly in view of the past political history of the region, would seem to be too clear to admit of any doubt as to its meaning or that it was intended to embrace within the boundaries and jurisdiction of the state of California the entire area of all those several bays and harbors which indent its coast. [5] The petitioner, however, argues that the first legislature of California placed a more limited interpretation upon the language of the constitution in its act (Stats. 1850, p. 58), creating and defining the boundaries of the several counties of the newly formed state. We are referred to the description of the boundaries of the county of Santa Cruz (then named Branciforte) in said act which reads as follows: "Beginning in the ocean three English miles from land at a point due west of the head of San Francisquito Creek, and running due east to the summit of the Santa Cruz Mountains; thence in a southeasterly direction along the summit of said mountains to the Pajaro River; thence down the middle of said river to the Bay of Monterey, and three English miles into the ocean; thence in a northwesterly direction parallel with the coast to the point of beginning." In interpreting this act, intended to set off the land and water

area of California into appropriate political subdivisions, we are to do so in such a way as to reconcile its terms, if reasonably possible, with the language of the constitution, since it would not be presumed to be the intent of the legislature to do that which it would have no power to do, viz., to exclude from the jurisdiction of the state of California or its political subdivisions any of its land or water areas which had been embraced therein by the express terms of its constitution. This being so, if there are any ambiguities in the act in question they are to be resolved in harmony with the text of the organic law. [6] Thus it is that when we find in the above quoted description the following course and distance, "Thence down the middle of said river to the Bay of Monterey and three English miles *into the ocean*," we are to assume that the framers of the act did not mean by the above emphasized phrase "*into the Bay*," since so to construe it would be not only to do violence to its words but to exclude the larger portion of Monterey Bay from the boundaries and jurisdiction of the state of California despite the very plain inclusion therein of the entire bay according to the constitution. The petitioner, however, lays especial emphasis upon the description reading, "Thence in a northwesterly direction *parallel to the coast* to the point of beginning." When, however, we read the act in its entirety we find that the phrase "parallel to the coast" is repeatedly applied with reference to the general coast lines of every coast county described therein, regardless of the bays and inlets along said respective coast lines. Reasonably interpreted this phrase may bear a meaning entirely consistent with the phrasing of the constitution which includes within the state boundaries "all islands, harbors and *bays* along and adjacent to the coast." When we come to consider the description of the county of Monterey as contained in the said act of 1850 the ambiguities of the act become still more apparent. Said description begins, "At the mouth of the Pajaro River on the Bay of Monterey," and ends, "Thence parallel with the coast *to the* place of beginning." It is thus plain that the northern boundary of Monterey County as thus given does not close with the southern boundary of Branciforte or Santa Cruz County even according to the petitioner's interpretation of the act. [7] The state legislature apparently had discovered this hiatus when it came to

adopt the provisions of the Political Code in 1872, since while it left the boundary of the county of Santa Cruz substantially unchanged on its oceanward side (Pol. Code, sec. 3952), it changed the boundary description of the county of Monterey so as to make it read: "Beginning *in the Pacific Ocean* at the southwest corner of Santa Cruz," etc., to the place of beginning. (Pol. Code, sec. 3935.) The entire bay of Monterey within its headlands and thence into the ocean for a distance of three nautical miles was thus, we think, definitely placed within the sovereignty of the state of California and within the boundaries and jurisdiction respectively of the counties of Santa Cruz and Monterey.

[8] The petitioner, however, insists that by the rules of international law the territorial jurisdiction of a maritime state does not extend beyond three miles from the shore line and follows the indentations of the coast into all bays or gulfs, the headlands of which are more than six miles apart, and cites certain text-writers upon international law in support of that contention. These text-writers give as the reason for this rule the somewhat fantastic one that while our modern international law was in the process of forming, the range of coast planted cannon did not exceed three miles. These text-writers, however, while suggesting such a rule based upon such a long-lost reason admit that as to the stronger maritime powers of modern Europe the rule was more honored in the breach than in the observance. Britain, which has depended more upon its "Wooden Walls" than upon its coast ordnance, has always asserted its sovereignty not only over the entire area of the bays, ports, harbors, friths, and other inlets along its much indented coast line, but also over the bays, gulfs, and inlets of its dependencies; such, for example, as the bay of Conception in Newfoundland, which has a breadth of fifteen miles. These text-writers also point out that France has always asserted sovereignty over the bay of Cancale, which is seventeen miles wide at its headlands, and that the United States asserts and has maintained its jurisdiction over the bays of Delaware and Chesapeake, although the former has a headland width of fifteen and the latter of twelve miles. In Moore's Digest of International Law the basis of our assertion of jurisdiction over the entire area of Chesapeake Bay is set forth in its reference to the

decision of the Commissioners of Alabama Claims, wherein the extent of that jurisdiction was directly involved. The decision of the commission is illuminating in its bearing upon the instant proceeding. It reads: "Considering, therefore, the importance of the question, the configuration of Chesapeake Bay, the fact that its headlands are well marked, and but twelve miles apart, that it and its tributaries are wholly within our own territory, that the boundary lines of adjacent States encompass it; that from the earliest history of the country it has been claimed to be territorial waters, and that the claim has never been questioned; that it cannot become the pathway from one nation to another; and remembering the doctrines of the recognized authorities upon international law, as well as the holdings of the English Courts as to the Bristol Channel and Conception Bay, and bearing in mind the matter of the brig 'Grange' and the position taken by the Government as to Delaware Bay, we are forced to the conclusion that Chesapeake Bay must be held to be wholly within the territorial jurisdiction and authority of the Government of the United States." While it is true that by treaties and conventions between the powers chiefly in arbitration cases the fixation of a six-mile distance between headlands of certain bays and inlets have at times been agreed upon in the settlement of international disputes, it cannot be said that there is any rule of international law upon the subject, the whole matter resting in the undisputed assertion of jurisdiction by the power of possessing the inclosing shore line of the bay or inlet in question. [9] This being so, we arrive at the conclusion that the bay of Monterey between its headlands and the ocean adjacent to a line drawn between these headlands for a distance of three nautical miles is within the boundaries of the state of California and of the counties respectively of Santa Cruz and Monterey. The particular location of the ship "Peralta" as given in the petitioner's application herein places it within the county of Santa Cruz and hence within the jurisdiction of the Superior Court in and for said County of Santa Cruz. It is not seriously contended by the petitioner that the acts which it proposes to do upon and by the use of said vessel and its equipment at said point would not, if permitted, constitute a violation of the laws of the state of California regulating the taking and reduction of that species of marine

fish known as "sardines." [10] It follows that the Superior Court in and for the County of Santa Cruz has jurisdiction over offenses against these laws; and hence that the alternative writ issued herein should be discharged and the application of the petitioner for a permanent writ of prohibition denied.

Shenk, J., Curtis, J., Seawell, J., Waste, C. J., Langdon, J., and Preston, J., concurred.