ISLAND AIRLINES, INC., Appellant,

v.

CIVIL AERONAUTICS BOARD,
Appellee.

No. 19752.

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1965.

Frank D. Padgett, Robertson, Castle & Anthony, Honolulu, Hawaii, for appellant.

John W. Douglas, Asst. Atty. Gen., J. William Doolittle, Morton Hollander, John C. Eldridge, Attys., Dept. of Justice, Washington, D. C., Herman T. F. Lum, U. S. Atty., Honolulu, Hawaii, for appellee.

J. Russell Cades, Wm. M. Swope, Smith, Wild, Beebe & Cades, Honolulu, Hawaii, for intervenor Aloha Airlines, Inc.

Richard K. Sharpless, Lewis, Buck & Saunders, Allen M. Stack, Pratt, Moore, Bortz & Vitousek, Honolulu, Hawaii, for intervenor Hawaiian Airlines, Inc.

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

BARNES, Circuit Judge:

The Civil Aeronautics Board in 1963 sought and obtained from the District Court of Hawaii a permanent injunction against the appellant Island Airlines, Inc. inter-island flights upon the ground the appellant was required to first obtain from the Federal Civil Aeronautics Board (before further operations between the respective Hawaiian Islands of Oahu, Maui, Kauai, Hawaii, Lanai and Molokai) a federal certificate of convenience and necessity authorizing such flights.

On appeal, this court remanded the matter to the district court with instructions to vacate its final decree, and enter new findings and a decree, determining what the boundaries of the State of Hawaii are. Island Airlines, Inc. v. Civil Aeronautics Board, 331 F.2d 207 (9th Cir. 1964).

After remand, the judgment was vacated; the two competing airlines (Hawaiian and Aloha Airlines) were permitted to intervene, and further hearings were had and additional evidence introduced. Thereafter the district court entered a new decision, reaffirming its previous findings and conclusions, and held the boundaries of Hawaii to be the Islands plus a three-mile belt around each. It enjoined all of appellant's inter-island flights. (235 F.Supp. 990 (D.Hawaii 1964).) This second appeal followed.

Jurisdiction below rested upon 49 U.S. C. §§ 1371 and 1487 and 28 U.S.C. § 1345; and here rests upon 28 U.S.C. §§ 1291 and 1294.

This cause was presented to this court on written briefs and oral argument, heard in Hawaii on April 15, 1965. On May 17, 1965, the Supreme Court of the United States rendered its opinion in United States v. State of California, 381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (No. 5 original, 1965), deciding several questions with respect to the seaward boundaries of California, with particular emphasis on the channel islands off Southern California, and the Farallones off Northern California. So that this court might have the benefit of counsel's views of the effect, if any of United States v. State of California on the instant action, this court on June 9, 1965, vacated the order of submission previous-

ly entered, and requested counsel to file simultaneous briefs. Both appellant and appellee filed such briefs; the two intervenors declining to file briefs. Upon receipt of the supplemental briefs this court again ordered the matter submitted, as of July 16, 1965.

We conclude we should affirm the decision of the district court. We think United States v. State of California, supra, supports our conclusion, if it does not require it. We think it necessary to discuss this case in some detail.

The 1965 decision of the Supreme Court (381 U.S. 139), was a continuation of an original suit filed in the Supreme Court in 1945 by the United States against the State of California under Art. III, § 2 of the United States Constitution. (United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).) Involved was the ownership of valuable oil rights in submerged lands lying off the coast of California, between the low-water mark and the three mile limit. The federal government was held to have "paramount rights" in such land. A decree was later issued (332 U.S. at 804–806, 67 S.Ct. 1658) referring to the existence in the United States of "paramount rights in, and full dominion and power over, the lands * * * lying seaward of the ordinary low-water mark on the coast of California, and outside of the inland waters, extending seaward three nautical miles * * *," and granting "the injunctive relief prayed for in the complaint" which enjoined "California and all persons claiming under it" from trespassing thereon in violation of said rights.

The history of the proceeding is best described in the 1965 Supreme Court syllabus (381 U.S. at 139, 85 S.Ct. 1658):

"Thereafter the Court appointed a Special Master to determine for specific coastal segments the line of ordinary low water and the outer limit of inland waters. In his Report, filed in 1952, the Master based his definition of inland waters on that applied by the United States in its foreign relations as of the date of the 1947 decree. Both parties noted exceptions to the Report, but before any further action, the Submerged Lands Act was enacted in 1953. This Act gave the States ownership of the lands beneath navigable waters within their boundaries, including the seaward boundaries 'as they existed at the time such State became a member of the Union,' but in no event to be interpreted as extending from the 'coast line' more than three geographical miles into the Pacific Ocean. 'Coast line' was derivatively defined in terms of the seaward limit of 'inland waters,' a term not defined by the Act. No action was taken on the Master's Report until 1963, when the United States filed an amended complaint reviving the Report and redescribing the issues as modified by the Submerged Lands Act."

In this amended complaint, the United States contended that the Submerged Lands Act "simply moved the line out three miles from the line established by the 1947 decree, while California asserts that 'inland waters' as used in the Act means not what the United States would claim as such in international relations but what the States historically considered to be inland when they joined the Union."

The Supreme Court then decided (1) that Congress, by eliminating the definition of inland waters from the Submerged Land Act intended to leave the meaning of the term to the courts, independently of the Act; (2) that the definition of "inland waters," as used in the Act, should conform to the "Convention on the Territorial Sea and the Contiguous Zone," to which the United States became a party in 1961, and which became effective as to the United States on September 10, 1964. In note 25 (381 U.S. at 162 n. 25, 85 S.Ct. at 1414) the opinion states that the 1947 decision "established that *landlocked waters* not a part of the open sea are not part of the marginal belt, and belong to the States." (Empha-

sis added.) The "only problem remaining * * * was that of determining where the open sea ends and the landlocked waters begin."

The Special Master appointed under the 1947 decision decided the question was controlled by the foreign policy position of the United States on the date of the California 1947 decree, i. e., October 27, 1947. That position, he found, was that a bay was inland water only if a closing line could be drawn across its mouth less than ten miles long enclosing a sufficient water area to satisfy the so-called Boggs formula, as to the sufficiency of the depth of bays. (Cf. 381 U.S. at 163 n. 27, 85 S.Ct. 1401.) But the Convention permits use of a different formula: a straight baseline method—with a twenty-four mile maximum closing line for bays and a "semi-circle" test for testing the sufficiency of the water area enclosed. The semi-circle test [1] and the twenty-four mile closing line "[u]nquestionably * * * now represents the position of the United States." (381 U.S. at 164, 85 S.Ct. at 1415.) And this position and the 1964 Supreme Court opinion "freezes" the meaning of "inland waters" in terms of the Convention.

The "subsidiary issues" decided in United States v. State of California, supra, were:

(1) That straight base lines (as used by Norway) to include "fringe of islands along the coast in [its] immediate vicinity" to the coast line, are permissible under the Convention to participating nations, but not to States of the United States when contrary to the expressed opposition of the United States itself.

(2) Under the twenty-four mile closing rule, Monterey Bay becomes inland waters, but the Santa Barbara Channel does not, despite the location of those islands, a distance of less than twenty-four miles at both ends of the channel between the coast line and the islands (i. e., between Point Concepcion and the northwestern tip of San Miguel and between the southern tip of San Clemente and Point Loma).

(3) The "Historic bay" theory,[2] under which both state and federal courts have previously found or been aided in finding that Monterey, Santa Monica, and San Pedro Bays have boundaries three miles outside a line from point to point closing the bays (because falling within Art. XII of the 1849 California Constitution).[3]

(4) "Roadsteads" are not inland waters.

(5) The line of "Ordinary Low Water" as used in the Convention and the Submerged Lands Act was lower low water line, or lower low tide average, not the average of all low tides.

(6) "Artificial accretions" can increase the state's land and extend the original three mile limit seaward, when done without the United States exercising its power over navigable waters to prevent it.

With these Supreme Court rulings in mind, we turn to the instant case.

Appellant urges twelve errors.[4] We summarize these as follows:

(1) The boundaries of a state are determined by Congress, not international law. Congress, by the Hawaiian Statehood Act, established the "channels" be-

1. "The semicircle test requires that a bay must comprise at least as much water area within its closing line as would be contained in a semicircle with a diameter equal to the length of the closing line." 381 U.S. 164, 85 S.Ct. 1415.

2. "Historic bays" are defined as: "[B]ays over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." 381 U.S. at 172, 85 S.Ct. at 1419.

3. Ocean Industries, Inc. v. Superior Court, 200 Cal. 235, 252 P. 722 (1927); Ocean

Industries, Inc. v. Greene, 15 F.2d 862 (N.D.Cal.1926) (Monterey Bay). People v. Stralla, 14 Cal.2d 617, 96 P.2d 941 (1939) (Santa Monica Bay). United States v. Carrillo, 13 F.Supp. 121 (S.D. Cal.1935) (San Pedro Bay).

4. "1. The Court below erred in placing the burden of proof on the State of Hawaii, which was not a party, and in granting an injunction because the State did not meet that burden.

"2. The Court below erred in not finding the channels between the Ha-

739

tween the Hawaiian Islands as being within the boundaries of the State of Hawaii. And even if we assume the enjoined flights pass over international waters subject to no sovereignty, such waters are not "a place" within the statute defining "interstate air transportation." (49 U.S.C. § 1301(21) (a).)

(2) The federal courts (a) should have abstained from exercising jurisdiction; (b) the federal courts had no jurisdiction; and (c) the State of Hawaii was an indispensable party.

(3) Certain findings as to flight patterns and effect on subsidies are without evidentiary support.

(4) There being error, as outlined above, the appellant's counterclaim should not have been dismissed.

■ We can agree with appellant that the boundaries of a state are deter-mined by Congress, and not by international law. But that does not foreclose Congress, in creating the boundaries, from following and adopting international law. And where the Congress has failed to delineate boundaries with certainty, the courts must define such limits. United States v. State of California, supra, 381 U.S. at pp. 150–160, 85 S.Ct. 1401. In doing so they need not ignore international law, nor the "position" of the State Department (idem, pp. 164–167, 85 S.Ct. 1401).

■ Nor can we agree that Congress, by the Hawaiian Statehood Act, established the *channels* between the islands as within the boundaries. As Judge Pence points out below (235 F.Supp. at 997), the Statehood Act itself (§ 2, 73 Stat. 4) says: "The State of Hawaii shall consist of all the islands, together with

waiian Islands to be within the boundaries of the State of Hawaii.

"3. The Court below erred in failing to hold that appellee did not have jurisdiction over flights between two points within the State of Hawaii passing over waters outside the State and not within the sovereignty of any government.

"4. The Court below erred in assuming jurisdiction of the cause when proceedings in the State tribunals had not been terminated.

"5. The Court below erred in not dismissing the complaint herein since it lacked jurisdiction under the provisions of Title 28, United States Code, Section 1342.

"6. The Court below erred in failing to hold that either the Public Utilities Commission of the State of Hawaii or the State of Hawaii itself was an indispensable party to the action.

"7. The Court below erred in not dismissing the complaint upon the grounds that the Supreme Court of the United States is vested with original jurisdiction of actions to which a state is an indispensable party.

"8. The Court below erred in holding (a) that appellant on Honolulu-Lihue flights had to adhere to federal airways on visual clearances; (b) that the airways west of Oahu and southwest of Kauai were beyond any territory claimed by the State as within its boundaries; (c) that instrument flights from Kahului to Hilo 'must' proceed via airway V6 since none of these findings were supported by the evidence, and (d) that appellant must accept such clearances to maintain the service required of it as an air carrier.

"9. The Court below erred in not holding that appellee's construction and application of the Federal Aviation Act resulted in unconstitutional and invidious discrimination against Hawaii, her people and appellant.

"10. The Court below erred in failing to hold that appellee was invidiously discriminating against Hawaii by attempting to enjoin appellant's flights on the basis of instrument clearances requiring it to fly to sea while not applying the same rule against California intrastate carriers, or, alternatively, that appellee's conduct was (a) unjust and inequitable and constituted 'unclean hands,' or (b) showed such flights to be '*de minimis*' and hence no basis for injunctive relief, or (c) constituted an administrative interpretation of the Federal Aviation Act showing such flights did not constitute a basis for federal jurisdiction.

"11. The Court below erred in finding that appellant's operations would result in a decrease in intervenors' revenues and an increase in their subsidy need without there being testimony in the record by witnesses on the stand and subject to cross-examination.

"12. The Court below erred in dismissing appellant's counterclaim." (Appellant's Brief, pp. 10–13.)

their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act."

In a careful examination of the claims once made by Hawaii, both as a monarchy and a republic prior to annexation to the United States in 1898, the district court opinion points out (235 F.Supp. at 997–1001) the conflict in the claims originally made in (a) the 1846 Statutes; (b) the Privy Council Resolution of August 29, 1850; (c) the 1854 Neutrality Proclamation; versus those made in (d) the 1849 Supreme Court decision (The King v. Parish, 1 Haw. 58 (1849)); (e) the repeal in 1859 of the 1846 Second Act of Kamehameha; (f) the Kingdom's Neutrality Proclamation of 1877; (g) the 1902 Supreme Court of Hawaii decision (Ter. of Hawaii v. Liliuokalani, 14 Haw. 88, 91–92 (1902)); and (h) the detailed enumerations in the Hawaiian Organic Act of April 30, 1900.

The trial judge then compared the claims as to the channels made by the Constitutional Convention of the State of Hawaii in 1951, and the testimony of the Hon. Joseph R. Farrington, Delegate in Congress from Hawaii; the Hon. C. Nils Tavares, Chairman of the Hawaiian Statehood Committee (formerly Attorney General of Hawaii, and now a United States Judge for the District of Hawaii); and the Hon. Oren E. Long, former Governor of Hawaii (later a United States Senator and then a member of the Statehood Commission) at the 1953–54 hearings before the Committee on Interior Insular Affairs of the United States Senate, 83d Congress on Statehood Bills, where: "all three jointly and severally stated positively and unequivocally that Hawaii made no claim for control of ocean waters beyond the traditional three mile limit."

Likewise the district court referred to similar hearings before the 84th Congress, which had developed no claim that the "territorial waters" of Hawaii went beyond the three mile limit. Finally, the district court opinion carefully anticipated the second United States v. California (381 U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (No. 5 Original, 1965)) holding by considering this country's national and international "position" on what constitutes "territorial waters" of islands; how they would have of necessity been bounded between the Hawaiian Islands; and how the title to "historic waters" is usually based on something approaching a prescriptive right; stating:

"The 'historic waters' concept constitutes an exception to the general rules of international law governing the delimitation of the maritime domain of a state. [note] Therefore, the title to 'historic waters' is generally considered in the nature of a prescriptive right, i. e., by virtue of 'acquisitive prescription'. The position of the United Kingdom in the Norwegian Fisheries case, United Kingdom v. Norway, was that a state can only establish title to areas of sea which do not come within the general rules of territorial or inland waters, on the basis of a prescriptive title. [note] Norway's position in the same case was 'the usage on which an historic title is based must be peaceful and continuous, and consequently * * * the reaction of foreign States constitutes an element to be taken into account in and appreciation of such title * * *.' [note]

At least three factors must be taken into consideration in determining whether a state has acquired an historic title to a maritime area. These factors are 1, the exercise of authority over the area by the state claiming the historic right; 2, a continuity of this exercise of authority; and 3, the attitude of foreign states. The authority which a state must continuously exercise over a maritime area in order to be able to claim it validly as 'historic waters' is sovereignty, i. e., it must be claimed as a part of its national domain. Absent international approval of the claim, the activities carried on by the state in

the area in question must be something far more objective than simply and solely internal verbalization, i. e., local legislation or proclamation: 1. The sovereignty claimed must be effectively exercised; the intent of the state must be expressed by deed and not merely by proclamations, e. g., keeping foreign ships or foreign fishermen away from the area, or taking action against them. 2. The *acts* must have notoriety which is normal for acts of the state. [note]

Continuous usage of long standing of the maritime area was demanded even in 1894 (Institute of International Law of 1894). Established usage generally recognized by the nations, was the criteria set up by the International Law Association of 1926. Since an historic title to a maritime area must be based on the active exercise of sovereignty over the area by the state claiming it, the activities from which the required usage must emerge was consequently a repeated or continued activity of that same state. Passage of time is therefore essential; i. e., the state must have kept up its exercise of sovereignty over the area for a considerable time. [note]

In the Fisheries Case, supra, Norway claimed that certain areas off the Norwegian coast (one of them demanding a 'baseline' boundary running over the open sea for a distance of 100 miles) were reserved for the exclusive fishing of her nationals. The United Kingdom claimed those areas were 'high seas'. The historic pattern of exercise of sovereignty showed that prior to the 17th Century there had been disputes between British and Norwegian fishermen in the areas, and as a result of Norway's complaints, the British did not fish in those areas for 300 years. Beginning in 1906, however, British vessels again appeared, with resulting frequent 'incidents' and much intergovernmental action, with British trawlers being arrested and condemned by Norway. The International Court of Justice found that the same were 'historic waters' of Norway. [note]

The burden of proving the open and notorious use of the area in question rests on the state claiming that its 'historical waters' possess a character inconsistent with the principle of the freedom of the high seas. Since the historic element is the basis for validating what is an exception to the general rule of freedom of the seas and therefore intrinsically invalid, the burden of proof is thus logically and emphatically placed upon the claimant state. [note]

When the claim of the Kingdom of Hawaii is measured in the light of the above rules of international law, it instantly becomes obvious that the nation of Hawaii ceded and turned over to the United States no valid claim of sovereignty over the inter-island (sic) channels.

\*　　\*　　\*　　\*　　\*　　\*

A study of the above case [United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960)] and other authorities [note] clearly shows that the term "territorial waters' has a uniformly well understood meaning and application, viz., the term includes 1, the water area comprising both inland waters (rivers, lakes and true bays, etc.) and 2, the waters extending seaward three nautical miles from the coast line, i. e., the line of ordinary low water, (ofttime called the 'territorial sea'). Seaward of that three-mile territorial sea lie the high seas. The Submerged Lands Act (1953) confirms titles to the States in the submerged lands off their coasts for a distance of three geographical miles from the coast line. Section 5(i) of the Hawaii Statehood Act reads:

'The Submerged Lands Act of 1953 \* \* \* and the Outer Continental Shelf Lands Act of 1953

742

* * * shall be applicable to the State of Hawaii, and the said State shall have the same rights as do existing States thereunder.' [note]" (235 F.Supp. at 1004–1005, 1007.)

But this approach, urges appellant, improperly placed the burden of proof on an absent nonlitigant, the State of Hawaii. We note that the State of Hawaii heretofore petitioned for leave to intervene as a party defendant, in this matter, and then, before the hearing, withdrew its petition and asked for and was granted leave to appear as amicus curiae only. Thus it had full opportunity to become a litigant had it desired. After it had knowledge of the decision below, it did not care to petition this court for leave to intervene. We assume it felt its interests, if any, were adequately protected by able counsel for other parties.

When the court below stated that "[t]he burden of proving the open and notorious use of the area in question rests on the state claiming that its 'historical waters' possess a character inconsistent with the principle of freedom of the high seas," and that "the burden of proof is thus logically and emphatically placed upon the claimant state" the court was referring, not to the State of Hawaii in this case, but to the State of Hawaii in any legal controversy in which such burden might arise, and to which controversy the State might be a party. And if any party to such litigation, such as the Hawaiian Public Utilities Commission, or a licensee thereunder, relies on such a "historic waters" exception to the general rule of law defining what constitutes the "high seas" (United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893)), it must stand in the shoes of the state claiming such an exception, and bear the burden of proof.

■ In our opinion, the evidence before the district court amply justified the trial court's opinion that the State of Hawaii, both in coming into union with and in its annexation to the United States, had not considered or insisted that the *channels* between the various islands of Hawaii were "historic waters" acquired by Hawaii by prescription.

■ Nor can we agree that the high seas over which the interisland flights are made are not "a place" within the statute defining the jurisdiction of the C. A. B. over interstate air transportation. (49 U.S.C. § 1301(21) (a).) The cases cited in the district court's opinion (235 F.Supp. at 994–995) and the congressional history (S.Rep.No. 80, 86th Cong., 1st Sess. 1–4 (1959)) show that the language "the air space over any place" outside a state makes interstate commerce "transportation between points in the same State over a foreign country or the *high seas* as well as over another state." A three-judge district court in this circuit so ruled in United Air Lines, Inc. v. Public Utilities Commission of California, 109 F.Supp. 13 (N.D.Calif. 1952). Unfortunately for this opinion on appeal, the Supreme Court of the United States refused to meet the issue now presented. The case was reversed on other grounds. 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140 (1953), see dissenting opinion of Mr. Justice Douglas, pp. 403–405, 74 S.Ct. 151.

■■ Appellate urges that the federal agencies and the courts should refrain from exercising jurisdiction, in view of the Hawaiian Supreme Court's decision, upholding the Hawaiian Public Utilities Commission's jurisdiction. (Application of Island Airlines, Inc., 47 Haw. 1, 384 P.2d 536 (1963).) Such position, in our view, begs the fundamental question. If the flights are intrastate, then of course, the federal courts should not permit the C. A. B. to require a certificate, but conversely, if the "channels" are high seas, then flight over them should and must be subject to the C. A. B.'s authority. This general principle of the supremacy of federal control over interstate and high seas flights must prevail, if the facts support it, over the paramount importance to the Hawaiian economy of inter-island air transportation.

The Hawaiian Supreme Court in coming to its opposite conclusion relied on Bob-Lo Excursion Co. v. Michigan, 333

U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455 (1948). There the commerce (a one-day excursion to a local Coney Island, located in but separated from Canada) was held to be foreign commerce, but of such local concern that the facts created an exception. No other case, said the Supreme Court,

> "involved so completely and locally insulated a segment of foreign or interstate commerce. In none was the business affected merely an adjunct of a single locality or community. * * * It is difficult to imagine what national interest or policy, whether of securing uniformity in regulating commerce, affecting relations with foreign nations, or otherwise, could reasonably be found to be adversely affected by applying Michigan's statute to these facts or to outweigh her interest in doing so." (333 U.S. at 39–40, 68 S.Ct. at 364.)

It is our view that Bob-Lo represents the sui generis case. It could be relied upon for example if the C. A. B. attempted to require certification of an air line from Honolulu to Manana Island.

Nor can we overlook a very practical question—if the "channels" between the islands were to be held inland waters, where would the boundaries lie? In oral argument the appellant here argued that a straight base line should be drawn completely around the western perimeter of the Hawaiian archipelago from island headland to island headland, i. e., from Niihau's Kawaihoa Point to Hawaii's Ka Lae, a distance of approximately 350 statute miles,[5] coming no closer than fifty miles to land over two-thirds of its distance. Even straight base lines running between headlands on either side of the channels between islands would produce resulting "channels" aptly described in the district court's opinion as "fantastic." Similar proposed boundaries have been rejected by the Supreme Court in the two California submerged land cases, supra.[6]

Appellant urges that this court should follow the rule of Public Utilities Commission of State of California v. United Air Lines, 346 U.S. 402, 74 S.Ct. 151, 98 L.Ed. 140 (1953). The district court opinion (109 F.Supp. 13 (N.D.Cal.1952)) was reversed by the majority of the Supreme Court's citation of one case—Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). That cited case held, after emphasizing there was not past, pending or threatened action by a state commission touching plaintiff's business: The suit could not be entertained as one for injunction and should not be continued as one for a declaratory judgment. The injunctive process was not available because there was no proof of act or threat constituting irreparable injury; and the declaratory judgment act was unavailable because there was no actual controversy. As the dissenting opinion in the United Air Lines case stated, the issue as to whether an air trip to Catalina Island (30 miles from California) was over high seas, and therefore under the exclusive jurisdiction of the C. A. B., was answered "yes" by the district court, and not answered by the Supreme Court. The Supreme Court did meet this issue in the second United States v. California case, supra.

[redacted] As to the alleged lack of jurisdiction, appellant relies upon 28 U.S.C. § 1342.[7] The applicability of that stat-

5. The "Cord of the bow"—see 235 F.Supp. at 1004, n. 19.

6. See map, Appendix A to dissenting opinion of Black, J., 381 U.S. at 213, 85 S.Ct. 1401.

7. 28 U.S.C. § 1342 reads as follows:

"§ 1342. Rate orders of State agencies

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance

ute rests upon two assumptions: (1) that Island Airlines is a public utility; and (2) the suit relates to an order affecting rates.

We need not pass upon the first requisite.

This suit was for a declaratory judgment and permanent injunction based on C. A. B.'s position that appellant was an air carrier engaged in transportation within the meaning of 49 U.S.C. § 1301 (10) and (21) (a) of the Act, without having obtained a C. A. B. certificate. This was not an attack on the rates appellant charged, but solely on the appellant's right to fly the route. As the trial court said: "* * * no problem is presented other than the determination by this court whether Island [Airlines] is carrying on air transportation in violation of Section 401(a) of the Act." (235 F.Supp. at 993.) Under § 1007 (49 U.S. C. § 1487) of the Act, the C. A. B. has congressional authority to sue for a violation of § 401(a). (49 U.S.C. § 1371 (a).) The district court has the authority to hear the suit under 28 U.S.C. § 1345 and 49 U.S.C. § 1487.

 We agree with the district court's conclusion:

"The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies." United States v. Le May, 322 F.2d 100, 103 (5th Cir. 1963), quoting from United States v. Fitzgerald, 201 F. 295, 296 (8th Cir. 1912).

 This is true, and injunctive relief will be granted, even though a state court action is pending raising the same issue, but with different parties. United States v. Deasy, 24 F.2d 108 (D.Idaho 1928). See generally Judge Yankwich's language in United States v. Fallbrook

of the order to the Federal Constitution; and,
 (2) The order does not interfere with interstate commerce; and,

Public Utility District, 101 F.Supp. 298 (S.D.Calif.1951).

There are other matters raised by appellant which we do not consider controlling. We refer particularly to alleged lack of evidence to support certain conclusions of the trial judge with respect to air traffic and flight patterns. Certain exhibits supported the court's conclusions. But at best, such evidence was mere "make weight" for the court's decision.

 We find no "invidious discrimination" against the State of Hawaii in the court's decision below. "Equal boundaries to each state are not necessary." United States v. Louisiana, 363 U.S. 1, 77, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960).

We finally note that in United Air Lines, Inc. v. Public Utilities Comm. of California, supra, it was held the C. A. B. had jurisdiction to regulate flights between the California mainland and Santa Catalina Island, a part of California, lying in the Pacific Ocean thirty miles (at its closest point) from the mainland. The basis for this holding was that the flights were in air space over the high seas after they had passed three miles from the mainland, and until they came within three miles of the island. We quote from that opinion:

"The record here shows, by stipulation, that there is a distance of about 30 miles between the shore line of the United States and the Santa Catalina Island. We have no difficulty in finding, and so find that a substantial portion of these 30 miles lies over the high seas and is not within the State of California. Hence it follows that air transportation through the air space thereover is over a place outside of the State of California.

 (3) The order has been made after reasonable notice and hearing; and,
 (4) A plain, speedy, and efficient remedy may be had in the courts of such State."

The Congress, by the statute, assumed jurisdiction over this area. This it had the power to do. In this field it has supremacy. Since the Congress had the power to assert federal jurisdiction, the plain language of the statute compels the conclusion that the Public Utilities Commission of the State of California has no jurisdiction or power to regulate in any manner the transportation activites of the plaintiff over the route in question." Id. 109 F.Supp. at 16.

We reach the same conclusion applied to the facts in the present case, strengthened by the majority Supreme Court opinion in United States v. California, supra.

Affirmed.